FOSTER v. BEAR VALLEY IRR. CO.

(Circuit Court, S. D. California. February 11, 1895.)

No. 591.

ESTOPPEL—CORPORATION—ACQUIESCENCE OF STOCKHOLDERS.

The B. L. & W. Co., a corporation organized to acquire water rights, and sell or lease the same for irrigation and other purposes, was the owner of a dam controlling the waters of the A. river, and held, by contract with the owners of the S. F. and N. F. ditches and the R. canal, certain rights of way for such water through said ditches and canal. In February, 1887, said company issued to its stockholders transferable certificates, entitling them to certain quantities of water from the dam, to be delivered at S., a point on the S. F. ditch, for which such stockholders, by concurrent contracts, agreed to pay one dollar per year for each certificate. From the time of the issue of such certificates, the holders thereof, at the request of the general manager of the B. L. & W. Co., and with the knowledge and approval of its directors, received the water to which they were entitled, not at S., as provided in the certificates, but at various points along the R. canal, which led from S. to a point about 3½ miles distant; this arrangement being for the advantage in certain respects of both parties. The certificate holders, with the knowledge of the company, constructed expensive and permanent works to connect with said R. canal, and to receive their water from it, and continued so to receive the water, without any charge in addition to the one dollar per year provided for in the certificates and contracts, until March, 1893, when the board of directors of the B. I. Co., which had succeeded to all the property, rights, and obligations of the B. L. & W. Co., passed a resolution fixing a charge for right of way of such certificate holders' water from S. through the R.

canal at two dollars per year in addition to the one dollar provided for in the certificates and contracts, pursuant to which resolution demand was made for such two dollars per year from March, 1893. *Held,* that the B. L. & W. Co. and the B. I. Co., as its successor, were estopped to demand from the certificate holders any sum for use of the R. canal in addition to the one dollar per year stipulated in the contracts, notwithstanding that there had been no formal action of the board of directors, and that three of the seven directors of the corporation, who consented to its course of conduct, were themselves interested as certificate holders; the whole transaction having been open, and easily to be known by any one interested in the corporation who paid attention to its affairs, and no stockholder having protested.

This was a suit by James Gilbert Foster, a creditor of the Bear Valley Irrigation Company, against that corporation, to procure the appointment of a receiver of its property, and enforce payment of its debts. Receivers were appointed, and, by an order entered April 2, 1894, were directed to proceed to collect all debts due the corporation. Pursuant to this order, the receivers made demands upon F. P. Morrison and sundry others for certain sums claimed to be due from them to the corporation. Morrison and the others petitioned the court to direct the receivers to withdraw their demand. The receivers answered, and the cause is heard on the petition and answer.

Chapman & Hendrick and W. J. Hunsaker, for receivers.
Gibson & Titus and Bicknell & Trask, for petitioners.

ROSS, District Judge. This suit was commenced by a creditor of the defendant insolvent corporation, to, among other things, procure the appointment of a receiver of its property and the enforcement of the payment of its debts, so far as possible. The defendant corporation is the successor in interest of another corporation, called Bear Valley Land & Water Company. The Bear Valley Land & Water Company was incorporated under the laws of the state of California, with a capital stock of $360,000, divided into 3,600 shares, of the par value of $100 each, for these purposes, among others:

"To acquire, by appropriation, purchase, condemnation, or otherwise, the ownership of water, water rights, and water privileges in the county of San Bernardino, state of California, and to hold, use, sell, or lease the same, or any part thereof, for domestic, irrigating, manufacturing, and other beneficial uses; also, to acquire, by purchase, condemnation, or otherwise, the ownership of rights of way over land in said county, so far as the same may be necessary, for the construction, maintenance, and use of dams, reservoirs, canals, ditches, pipes, flumes, conduits, and aqueducts necessary to collect, store, convey, and distribute water for each and all of the aforesaid purposes, and to purchase, own, hold, and construct, and maintain, and use such structures and waterworks, and sell or lease the same, or any part thereof."

The defendant, Bear Valley Irrigation Company, was likewise incorporated under the laws of the state of California, for similar purposes, in addition to other purposes, not necessary to be stated. The Bear Valley Land & Water Company, in 1884, constructed a large and costly dam in San Bernardino county, in one of the tributaries of the Santa Ana river, thereby impounding, among other waters, the waters of that stream, for the purposes of distribution and sale for domestic use, irrigation, and other beneficial purposes.

:At that time, the summer flow of the Santa Ana river at the mouth of the Santa Ana cañon, known as the "Divide," was appropriated and diverted by means of two ditches, one called the "North Fork Ditch," and the other the "South Fork Ditch"; and with the appropriators of those waters, by means of those ditches, the Bear Valley Land & Water Company, in the year 1885, entered into certain contracts. By the contract with the owners of the North Fork ditch, the Bear Valley Land & Water Company acquired, among other things, a right of way for the carriage of its water through that ditch from its head, at the point known as the "Divide," to a point known as "Haven's Corner," distant in a westerly direction about eight miles; and, by the contract with the owners of the South Fork ditch, the Bear Valley Land & Water Company acquired, among other things, a right to carry its water through the South Fork ditch from its head, at the Divide, to a point in an easterly and southerly direction distant about three miles, known as the "Sycamore Tree"; and to this point the Bear Valley Land & Water Company, by the contract, agreed to deliver certain water free of expense to the owners of the South Fork ditch. On the 12th of February, 1887, the Bear Valley Land & Water Company acquired from the Redlands Water Company (also a California corporation) a certain aqueduct known as the "Redlands Canal," extending from the sycamore tree to the Redlands reservoir, upon the condition, however, that the Redlands Water Company should have—

"The perpetual right of way through said canal, and any enlargement thereof, or any addition thereto, and through any canal or aqueduct constructed hereafter in lieu thereof by party of the second part [Bear Valley Land & Water Company], its successors and assigns, for the following amounts of water belonging to the party of the first part [Redlands Water Company], to wit: (1) 108 inches of water, measured under a 4-inch pressure, known as the 'Santa Ana Tunnels' and 'Morton Cañon' water. (2) The water represented by 50 shares of the Sunnyside division of the South Fork ditch, reduced to a constant stream equal and proportionate with the total amount of water represented by said 50 shares, including the right of way for said water accumulated in accordance with the provisions of a certain contract between the South Fork ditch of the Santa Ana river and the party of the second part, recorded in the recorder's office of said county, dated ——, 1886, and recorded in book —— of Agreements, at page —— thereof. (3) An amount of water, not to exceed 200 inches of water, measured under a four-inch pressure, of waste water, from Mill creek, whenever there may be water in the Mill creek water ditch, so called, for party of the first part."

The grant contained this further provision, among others:

"The right of way for all the water particularly above described through said canal, or any enlargement thereof or addition thereto, or any canal built in lieu thereof as aforesaid, shall have precedence of any other right of way for the conveyance of any and all other water to be conveyed in said canal, enlargement thereof, addition thereto, or in any canal that may be built in lieu thereof, as aforesaid."

The grant contained the further provision that the Bear Valley Land & Water Company should receive the water so specifically described at the head of the Redlands canal, and that it should suffer no loss in transit between that point and the Redlands reservoir. The fourth clause of the grant contained the provision that the Redlands Water Company shall bear its share of the expense of main-

taining the Redlands canal, or any addition thereto, **or any enlarge-ment thereof, or any canal built in lieu thereof, in the proportion that the amount of water used by it, and for which it has a right of way through said canal, bears to the whole amount of water having a right of way through it.**    And its fifth clause is as follows:

"It is further understood and agreed that the party of the first part [the Redlands Water Company], by its zanjero, shall have the right to divert water from said canal at any or all points of use thereof; provided, however, that said zanjero shall not divert in all more water than that to which party of the first part [the Redlands Water Company] is or will become entitled."

The Bear Valley Land & Water Company, after acquiring the Redlands canal, extended it by means of a pipe line from a point near the Redlands reservoir westward to Cajon street, in Redlands.

The capital stock of the Bear Valley Land & Water Company was, as has been said, divided into 3,600 shares, of the par value of $100 each; and in June, 1886, that company resolved to issue to its stockholders 7,200 of what are called "Class A" water certificates,—that is to say, two of such certificates for each share of its stock,—the recipient of each of which to sign, as a part of the same transaction, a certain written contract.    Three thousand four hundred and twenty-nine, in the aggregate, of such certificates, are, and have been since February, 1887, held by the petitioners in the present proceeding and their predecessors in interest.    With the exception of the names of the respective holders and numbers, each of such certificates is in the following form:

"(Class A.  7,200 certificates.  Issue of June 1, 1886.)

"No. ———.  Number of certificates, ———.

"Bear Valley Land and Water Company Water Certificate.

"These ——— certificates, issued by the Bear Valley Land and Water Company, a corporation, to ———, for ——— acres, are guarantied by said company to entitle the holder hereof to receive a continuous flow of one-seventh of an inch of water to each acre of land to which the same shall be devoted, or multiple thereof, as is designated on the face hereof, for the six summer months in each year, for the contract times beginning under the contracts of this company with the North and South Fork ditches, respectively.  The inch mentioned herein is equivalent to a flow of one-fiftieth of a cubic foot per second.  The holder of this certificate may elect to accumulate the use of water hereunder in any one or more months of said six months, the aggregate in any one month not to exceed one-fourth of the whole for that year, and the holder is also entitled to his proportion of the six months' winter water accruing under the contracts of the North or South Fork ditches, on which it may be used in the proportion which this issue of certificates and those that may be hereafter issued bears to the whole of such benefits.  The point of delivery of water used under this certificate shall be at the points designated in the contracts with the North and South Fork ditches, respectively.  This issue or award of water is adopted as a method of distribution and of the use of the same to the company's stockholders, in consideration of the covenants contained in the indorsement hereon; and the interest represented by this certificate shall not become appurtenant to or pass by voluntary act or by operation of law with any land upon which the water represented may be used.  A transfer hereof shall only be made by surrender of this certificate to the company, and the reissuance of a new certificate, and upon the signature of the concurrent contract on the records of the company.

"———————, President.

"[Seal of said company.]          ———————, Secretary."

Indorsement: "The holder of this certificate hereby accepts the same on the following conditions:  That this certificate shall and is to be held subject to

and in accordance with the terms of the contract signed by the holder hereof upon its issuance by the company."

The contract mentioned in the indorsement on the certificate to be signed by the holder was signed by each of the petitioners, or their predecessors in interest, and, with the appropriate insertion of names and numbers, is as follows:

"Know all men by these presents, that whereas, the Bear Valley Land and Water Company, a corporation, has this day issued to the undersigned, ——— certificates of said corporation, being certificate No. ———, in consideration of the agreements hereinafter contained, and subject to the conditions hereinafter set forth and contained in said certificate, and the undersigned has received and accepted said water certificates subject to all such agreements and conditions: Now, therefore, we hereby agree that in consideration of the issuance of said water certificates to us by said corporation, and in payment for the water which said certificates entitle us to receive each year from said corporation in accordance with the provisions of said certificate, we will, without notice or demand, pay to said corporation annually hereafter, and within thirty days after the first day of January in each year, the sum of ——— dollars, being one dollar per year on each of said water certificates, such payment to be made at the office of said corporation, in the city of San Bernardino, state of California. And, if said sum of ——— dollars be not paid to said corporation in full at the time and in the manner hereinbefore provided, then said certificate No. ———, and all covenants and agreements therein contained, and the water certificates therein referred to, shall become and be null and void, and all rights thereunder shall be forfeited, and shall forever cease and determine, and the foregoing contract shall be void. And, whenever said certificate No. ——— shall be surrendered to and canceled by said corporation, then the foregoing contract shall be void. In witness whereof, we have hereunto set our hands and seals, this seventh day of July, A. D. 1887."

The order of instructions to the receivers herein, of date April 2, 1894, contained the following provision:

"That said receivers be, and they are hereby, authorized to proceed to the collection of all debts due and demands owing to the said Bear Valley Irrigation Company, or payable to said receivers as such; and for such purpose they are hereby authorized and empowered to take all such steps as may be necessary in their judgment, including the power to bring suits, to collect any such debts, dues, or demands, where the same are, in the judgment of said receivers, collectible, and are not paid to them on demand."

And the Bear Valley Irrigation Company having theretofore, to wit, on the 14th day of March, 1893, at a regular meeting of its board of directors, passed this resolution:

"Resolved, that the annual charge for right of way for the flow of water represented by class A of the Bear Valley Land & Water Company certificates from the point of delivery specified in said class A certificates through any of the ditches, canals, and pipe lines of the Bear Valley Irrigation Company in the East San Bernardino valley, except the Green Spot line and the Allessandro pipe line, be fixed at the sum of two dollars per year in addition to the annual charge for rental now reserved in said certificates,"

—the receivers, on the 26th of April, 1894, made a demand, in writing, upon the petitioners in the present proceeding for the additional charge mentioned in the resolution of the board of directors of the defendant corporation of March 14, 1893; the petitioners having, ever since that date, taken the water claimed under the class A certificates through the Redlands canal, and not at the point mentioned in the certificates and concurrent contracts.

Thereafter, to wit, on August 6, 1894, F. P. Morrison, A. G. Hubbard, A. Pfeiffer, S. Pfeiffer, C. A. Tripp, Warner Bros., M. Mattice, George A. Cook, H. M. Barton, Drew & Fairbanks, H. L. Drew, the Redlands, Laguna & Crafton Domestic Water Company, the East Redlands Water Company, the Redlands Water Company, and the Mound City Land & Water Company (the last four named being corporations organized and existing under the laws of California), holders, in the aggregate, of 3,429 of the class A water certificates, filed their petition, praying that the receivers be directed to recall the demand for the aforesaid additional charge of two dollars for each certificate, as fixed by the resolution of the board of directors of the defendant corporation of March 14, 1893, and that the receivers be directed to furnish and supply water to petitioners through the Redlands canal under the class A certificates and concurrent contracts, upon the same terms and conditions as such water had been theretofore furnished and supplied to petitioners and their respective predecessors in interest; namely, for one dollar per annum for each certificate.

In support of the petition, the petitioners allege, in effect, that, notwithstanding the point of delivery was by the certificates and concurrent contracts fixed at the sycamore tree aforesaid, nevertheless, at the request of the Bear Valley Land & Water Company, the petitioners and their predecessors in interest have ever since about the 12th day of February, 1887, received their respective shares of water under class A certificates through the Redlands canal, without let, hindrance, interruption, or objection, or any understanding, express or implied, or demand being made for any compensation or charge, other than that expressed in and provided for in said certificates and said concurrent contracts, until the demand made by the receivers heretofore appointed in the above-entitled action; that the petitioners do now divert, and they and their predecessors in interest have ever since February, 1887, diverted, their respective shares of water under the class A certificates from and at various points along the Redlands canal; that, with the water so supplied and used, about 3,400 acres of land, devoted principally to the growth of citrus and deciduous fruit trees and vineyards, are irrigated, and about 4,000 people supplied for domestic purposes; that petitioners and their predecessors in interest have regularly paid to the defendant corporation and its predecessor in interest the amount specified in the certificates and concurrent contracts; that petitioners and their predecessors in interest, relying upon the request of the Bear Valley Land & Water Company to take their water through the Redlands canal, and that corporation's acts in furnishing it to them without cost or expense other than that provided for in said class A certificates and concurrent contracts, did not construct or procure other aqueducts to convey their said water, and at much outlay made connection with the Redlands canal to receive the same; that the defendant corporation, long prior to the commencement of the present suit, acquired, and still owns and holds, all the property of the Bear Valley Land & Water Company, and has fulfilled all the obligations and

undertakings of that corporation with respect to furnishing and supplying water under and to holders of said class A water certificates as the same had been theretofore supplied and furnished by the Bear Valley Land & Water Company. The receivers filed an answer to the petition, admitting some and denying other of its allegations, and also filed a cross petition, in which is set up the resolution of the board of directors of the defendant corporation of March 14, 1893, and also the order of this court appointing the receivers herein, and their subsequent demand upon the petitioners of payment of the additional charge provided for by the resolution of March 14, 1893, and alleging that at all times since the passage of that resolution the petitioners, with full knowledge of its passage, have taken the water represented by class A certificates through the Redlands canal, and not at the point mentioned in the certificates and concurrent contracts; wherefore the receivers ask, not only that the application of the petitioners be denied, but that they be required to pay for the use of the Redlands canal the additional charge provided for by the resolution of the board of directors of the defendant corporation.

The position of both parties to the controversy is based upon the assumption of the validity of class A certificates; the receivers claiming the right to demand and receive the additional charge imposed by the resolution of the defendant corporation for the conveyance through the Redlands canal and its extension of water represented by them; and the petitioners claiming that the receivers have not that right, for the reasons—First, that the facts of the case estop the defendant corporation from making any such additional charge; and, second, if this be not so, that the payment provided for in the certificates and concurrent contracts, to wit, one dollar per annum for each certificate, was intended to cover all charges for the delivery of water represented by those certificates, irrespective of the point of delivery; and, third, in respect to the Redlands Water Company, that, under the provisions of the conveyance from it to the Bear Valley Land & Water Company, the Redlands Water Company has the right to have the water represented by the class A certificates held by it carried through the Redlands canal without any charge. The court therefore indulges the assumption upon which the respective claims of the parties are based, and proceeds to determine the controversy without considering or deciding any question touching the validity of the certificates themselves.

There is no doubt, I think, that the right asserted by the petitioners constitutes an easement and interest in real property, and is therefore to be governed by the law of the state of California, a provision of which is that an interest in land can be conveyed only by an instrument in writing. But to cases of estoppel in pais the statute of frauds does not apply.

"It has never been held," said the supreme court in Dickerson v. Colgrove, 100 U. S. 583, "that the statute of frauds applies to cases of inurement, and it has been conceded that it does not affect cases of dedication. Where is the difference in principle in this respect between those cases and the one

before us? [A case of estoppel in pais.] But here this point cannot arise, because the promise relied upon was in writing. In City of Cincinnati v. Lessee of White, 6 Pet. 431, this court, speaking of the dedication there in question, said: 'The law considers it in the nature of an estoppel in pais, which precludes the original owner from revoking such dedication;' and that a grant might have been presumed 'if that had been necessary, and the fee might be considered in abeyance until a competent grantee appeared to receive it, which was as early as the year 1802, when the city was incorporated.' Here there was a grantee capable of taking the fee all the time, from the date of the letter. The common law is reason, dealing by the light of experience with human affairs. One of its merits is that it has the capacity to reach the needs of justice by the shortest paths. The passage of a title by inurement and estoppel is its work without the help of legislation. We think no sound reason can be given why the same thing should not follow in cases of estoppel in pais where land is concerned."

In Wiseman v. Lucksinger, 84 N. Y. 41, much relied upon by the receivers, the court of appeals of New York said:

"There are, no doubt, many cases in which courts recognize an equitable right to an easement without a deed; but there will be found in them either an express agreement for an easement, or an acquiescence or consent by conduct which has led to the erecting of permanent works or valuable and lasting improvements, or some other fact which would make the assertion of a legal title operate as a fraud upon the persons setting up the equitable right."

Is the present one of those cases? The proof shows that the petitioners and their predecessors in interest, ever since the issuance to them, respectively, of class A certificates, have taken the water represented by those certificates, not at the point mentioned in them and in the concurrent contracts,—namely, the sycamore tree,—but through the Redlands canal and its extension at the several points most convenient for their respective use. This course of conduct was commenced at the suggestion of the then engineer and general manager of the Bear Valley Land & Water Company, F. E. Brown, after consultation with the president and other directors of the company, and with their verbal consent, and was continued without any manifestation of dissent on the part of the Bear Valley Land & Water Company, or its successor in interest, the Bear Valley Irrigation Company, until the passage by the board of directors of the last-named corporation of the resolution of March 14, 1893,—a period of more than seven years. There was never, however, any record action of the board of directors of either corporation authorizing or consenting to such use of the Redlands canal or its extension by the petitioners or their predecessors in interest, or either of them. The connections made with the Redlands canal and its extension by the petitioners and their predecessors in interest, for the purpose of taking therefrom the water represented by the class A certificates held by them respectively, were made at their own expense, but under the direction and supervision of the engineer and general manager of the company. Some of them were made at different points within the first mile, southerly, of the sycamore tree; some within the second mile; some within the third mile; and many of them at the terminus at Cajon street, which is distant about 3½ miles from the sycamore tree. All of the connections were permanent in charac-

ter, not designed for temporary use, but substantial, costly, and intended to remain for all time. From these respective points of diversion, the petitioners and their predecessors in interest laid, at heavy expense, lines of pipe extending many miles for the conveyance of such water to the respective places of use. The proof shows that to have built such lines of pipe or other conduits to the point known as the "Sycamore Tree" would at the same time have cost considerably more, but that now, by reason of the highly-improved condition of the intervening lands, the procurement of rights of way for pipes or other conduits to that point would be very costly. From the time of the making of the respective connections, the water represented by the class A certificates held by the petitioners and their predecessors in interest has been regularly distributed through them to the respective holders of such certificates by the regularly appointed zanjero of the company. The reasons assigned by the witness Brown for his suggestion that the holders of class A certificates take the water represented by them through the Redlands canal and its extension, instead of at the point designated in the certificates and concurrent contracts, is that value would thereby be added to the certificates, and at the same time the company would be benefited by thus keeping the water together for a greater distance, which would prevent loss by evaporation and seepage. During all of this time, Brown was a holder of class A certificates, and otherwise pecuniarily interested in taking the water represented by such certificates from the Redlands canal and its extension, as were also at least two of the other directors of the Bear Valley Land & Water Company.

Do the facts stated estop the defendant corporation from imposing upon the respective petitioners an additional charge of two dollars for each certificate held by them, respectively, for the conveyance of the water represented by such certificates to the respective places of diversion so established? If the party to whom the estoppel is sought to be applied was an individual, it would seem to be clear that he would be estopped.

"The vital principle," said the supreme court in Dickerson v. Colgrove, supra, "is that he who, by his language or conduct, leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by disappointing the expectations upon which he acted. Such a change of position is sternly forbidden. It involves fraud and falsehood, and the law abhors both. This remedy is always so applied as to promote the ends of justice. It is available only for protection, and cannot be used as a weapon of assault. It accomplishes that which ought to be done between man and man, and is not permitted to go beyond this limit. It is akin to the principle involved in the limitation of actions, and does its work of justice and repose where the statute cannot be invoked."

In that case the supreme court referred with approval to the case of Faxton v. Faxon, 28 Mich. 159, where a mortgagee holding several mortgages prevailed on a son of the deceased to remain on the premises, and support the family, by assuring him that the mortgages should never be enforced. The son supported the family, and the property grew in value under his tillage. After the lapse of several years, the mortgagee proceeded to foreclose. He was

held to be estopped by his assurances, upon which the son had acted. The court there said:

"The complainant may have estopped himself without any positive agreement if he intentionally led the defendants to do or abstain from doing anything involving labor or expenditure to any considerable amount by giving them to understand they should be relieved from the burden of the mortgage. In Harkness v. Toulmin, 25 Mich. 80, and Truesdail v. Ward, 24 Mich. 117, this principle was applied,—in the former case, to the extent of destroying a chattel mortgage; and in the latter, of forfeiting rights under a land contract, where parties were made to believe they were abandoned. There is no rule more necessary to enforce good faith than that which compels a person to abstain from asserting claims which he has induced others to suppose he would not rely on. The rule does not rest on the assumption that he has obtained any personal advantage, but on the fact that he has induced others to act in such a manner that they will be seriously prejudiced if he is allowed to fail in carrying out what he has encouraged them to expect."

In Flickinger v. Shaw, 87 Cal. 126, 25 Pac. 268, Shaw agreed that Flickinger and Smith should have the right of way over his land for a ditch, and they agreed to construct the ditch and keep it in repair; the ditch, when completed, to be used by the contracting parties in irrigating their respective tracts of land with water which they were to have in certain proportions. The court said:

"The above facts clothe the transaction with the character of a purchase by one party, and sale by the other, of a right of way for a ditch. The license under which Flickinger and Smith entered was vested in them by a contract of purchase for a valuable consideration. Under this agreement, Flickinger and Smith did survey and construct the ditch, and kept it in repair, and both parties made use of it for the purpose for which it was constructed. viz. the irrigation of their lands. Thus, the agreement between the parties was executed. The license here given to Flickinger and Smith was one for the acquisition of an interest in land by purchase of Shaw, for which they paid by doing what they had agreed to do. After the ditch was constructed, it was used by all parties under the agreement for four or five years. Now, it would be highly inequitable, after the work has been done and money expended by Flickinger and Smith, to allow Shaw to recall his consent, fill the ditch, and cut Flickinger, who has succeeded to all the rights of Smith under the agreement above stated, off from the use of the ditch and the water flowing therein; nor should any such proceeding, in our view, be upheld by a court of justice."

While the court held that an agreement of purchase and sale entered into the transaction there under consideration, it likened the case to one of an executed license, in which there is no agreement of purchase and sale, citing with approval the cases of Rerick v. Kern, 14 Serg. & R. 271, Pope v. Henry, 24 Vt. 565, and Swartz v. Swartz, 4 Pa. St. 358.

The same view was taken by the supreme court of Nevada in the case of Lee v. McLeod, 12 Nev. 285, where Judge Hawley, then chief justice of that court, said:

"The principle that expending money or labor in consequence of a license to divert a water course or use a water power in a particular way has the effect of turning such a license into an agreement that will be enforced in equity has been frequently announced by the courts. In all such cases the execution of the parol license supplies the place of a writing, and takes the case out of the statute of frauds,"—citing a number of cases.

Whether the agreement under which the petitioners and their predecessors in interest commenced and continued to use the water

represented by the class A certificates held by them, respectively, through the Redlands canal and its extension, be regarded as an easement, or an executed parol license, the distinction between which, as said by Chancellor Kent, is quite subtle, and at times difficult to discern (3 Kent, Comm. 592), equity will give it effect, because it would be against conscience and a fraud to permit it to be repudiated, unless the relation of the directors of the corporation here sought to be estopped to the petitioners or their predecessors in interest, or the circumstance that there was no formal action of the board of directors of either of the corporations authorizing the agreement, takes the case out of the rule that would be applied were the party against whom the estoppel is set up a private individual. At least three of the seven directors of the corporation verbally consenting to the course of conduct described were, as has been said, holders of class A certificates, or otherwise interested therein. In Oil Co. v. Marbury, 91 U. S. 587, Mr. Justice Miller, delivering the unanimous opinion of the supreme court of the United States, said:

"That a director of a joint-stock corporation occupies one of those fiduciary relations where his dealings with the subject-matter of his trust or agency, and with the beneficiary or party whose interest is confided to his care, is viewed with jealousy by the courts, and may be set aside on slight grounds, is a doctrine founded on the soundest morality, and which has received the clearest recognition in this court and others. Koehler v. Iron Co., 2 Black, 715; Drury v. Cross, 7 Wall. 299; Railroad Co. v. Magnay, 25 Beav. 586; Iron Co. v. Sherman, 30 Barb. 553; Hoffman Steam Coal Co. v. Cumberland Coal & Iron Co., 16 Md. 456. The general doctrine, however, in regard to contracts of this class, is not that they are absolutely void, but that they are voidable at the election of the party whose interest has been so represented by the party claiming under it. We say this is the general rule, for there may be cases where such contracts would be void ab initio, as when an agent to sell buys of himself, and by his power of attorney conveys to himself that which he was authorized to sell. But even here acts which amount to a ratification by the principal may validate the sale."

"It is not necessary that an act of ratification be shown on the part of every individual shareholder; but proof of circumstances from which the court or jury can reasonably infer that the act in question was generally known among the shareholders, and was acquiesced in by them, will constitute at least prima facie evidence of ratification. In many cases knowledge may be presumed from circumstances, and assent may be implied from silence or a failure to act. In those cases in which the doctrine of estoppel can be invoked to charge all the shareholders of a corporation with acquiescence in acts which they ought to have known, and which they cannot, in justice, be allowed to repudiate, proof of the facts on which the estoppel is based is sufficient to charge the corporation." 2 Mor. Priv. Corp. § 633, and authorities there cited.

In Kent v. Mining Co., 78 N. Y. 187, Folger, J., delivering the opinion of the court, said:

"Where third parties have dealt with the company, relying in good faith upon the existence of corporate authority to do an act, there it is not needed that there be an express assent thereto on the part of the stockholders to work an equitable estoppel on them. Their conduct may have been such, though negative in character, as to be taken for an acquiescence in the act; and when harm would come to such third parties, if the act were held invalid, the stockholders are estopped from questioning it. We suppose acquiescence or tacit assent to mean the neglect to promptly and actively condemn the unauthorized act, and to seek judicial redress from knowledge of the commit-

tal of it, whereby innocent third parties have been led to put themselves in a position from which they cannot be taken without loss."

In Underhill v. Santa Barbara, etc., Co., 93 Cal. 300, 28 Pac. 1049, the supreme court of California held that:

"Acts of the directors in violation of a by-law may be ratified by the shareholders, and, generally, by the same number of shareholders that would be necessary to enact them. Such ratification need not be formally made in a meeting of the stockholders, but may be presumed from the circumstances of the case, such as long acquiescence in acts beneficial to the corporation, with knowledge of all the material facts."

In Reuter v. Telegraph Co., 6 El. & Bl. 341, by the deed of settlement of the corporation, which was formed under a royal charter, the board of directors were invested with a general authority to conduct the affairs of the company; all contracts above a certain value were to·be signed by at least three individual directors, or sealed with the seal of the company, under the authority of a special meeting. The company was sued upon a contract above the prescribed value, which had been given by the chairman verbally. Upon an agreed statement of facts, the court of queen's bench held that the contract executed by the chairman without authority had been rendered binding upon the company by the subsequent acquiescence of the board of directors. The same rule was applied in Beecher v. Mill Co., 45 Mich. 103, 7 N. W. 695, and in Bank v. Averell, 96 N. Y. 467. The application of the doctrines of ratification and estoppel depends in each case upon its particular circumstances. "The equity of the case must be determined. It is necessary to consider the character of the act with which it is sought to charge the corporation, the importance of the act, and the degree of publicity which was given to it. The good faith or bad faith of the parties, and their business relations, are also important considerations." 2 Mor. Priv. Corp. § 631a; Thomas v. Railway Co., 1 McCrary, 392.[1] In the case at bar none of the acts relied upon as constituting the estoppel were concealed. On the contrary, they were of such a character that they must have been known to every one having an interest in the respective companies not willfully blind to them. There is nothing in the case to show that the privileges accorded by the directors to the petitioners and their predecessors in interest were injurious to the respective corporations, or either of them, but there is evidence tending to show that some benefit was derived by the corporations by keeping the waters together for the longer distance, thus preventing to some extent loss by evaporation and seepage. The acts of the petitioners and their predecessors in interest in accepting the privileges accorded by the directors involved large expenditures of money, publicly made, permanent in character, and so used that every one taking any, even the slightest, interest in the affairs of the corporations, must have been apprised of the facts; for the evidence shows that for more than seven years the regularly appointed zanjero of the respective corporations regularly distributed to the petitioners

[1] 2 Fed. 877.

and their predecessors in interest, through their said connections so established with the Redlands canal and its extension, the water represented by the class A certificates held by them respectively. Good faith and fair dealing require that those who have made such large expenditures in acceptance of the privileges accorded them, and have been so long in the open and undisturbed enjoyment of them, should be protected against any additional burden sought to be imposed by those who have not only stood by and acquiesced therein, but who have, through their regularly appointed zanjero, actively ratified and continued the privileges in question.

The views above expressed render it unnecessary to decide the other points made by the petitioners. An order will be entered directing the receivers to recall the demand upon the petitioners for payment of the additional charge provided for by the resolution of the defendant corporation of March 14, 1893.