Mr. Justice DAVIS
 

 delivered the opinion of the court.
 

 The transaction which this case discloses cannot be sustained by a court of equity. The conduct of the directors of this railroad corporation was very discreditable, and without authority of law. It was their duty to administer the important matters committed to their charge, for the mutual benefit of all parties interested, and in securing an advantage to themselves, not common to the other creditors, they were guilty of a plain breach of trust. To be relieved from their indorsement, they were willing to sacrifice the whole property of the road. Bound to execute the responsible duties intrusted to their management, with absolute fidelity to both creditors and stockholders, they, nevertheless, acted with reckless disregard of the rights of creditors as meritorious as those whose paper they had indorsed. If Bailey & Co. had sold iron to build the road, so had the Boston association sold locomotives to run it. It is not easy to see why the corporation should exhaust' its effects to pay one, and leave the other unpaid. But, it is said, the directors, being unable to pay both, had the right to choose between them. We do not deny that a debtor has a legal right to prefer one-creditor over another, when the transaction is
 
 bond fide;
 
 but
 
 *303
 
 this is, in no just sense, a case of preference between creditors. If the law permits the debtor, in failing, circumstances, to make choice of the persons he will pay, it denies him the right, in doing it, t.o contrive that the unpreferred creditor shall never be paid. In other words, the law condemns any plan in the disposition of property which necessarily accomplishes a fraudulent result.
 

 That the plan adopted by the directors of this railroad to dispose of its property to Cross & Co. was a fraudulent contrivance, and necessarily, .if executed, accomplished a fraudulent result, is too plain for controversy. At the time this •scheme was initiated,' there were only five miles of-track laid, the company hopelessly .insolvent, and the enterprise abandoned. In this condition of things, the directors were sued on their indorsement, and, as was natural, manifested an anxiety to have.-the property of the company pay the debt for which they were liable. .But Bailey & Co. preferred not to enforce .their mortgage lien, and only consented to allow it to be done, on being indemnified against the risk and expense of the suit. The directors, in furnishing them this indemnity, in order to procure the enforcement of the mortgage lien to the extent of $42,000, which in their hands was a just debt against the company, were guilty of no wrong. But' the departure from right conduct, on their part, commenced at this point. Notwithstanding they had the control of the foreclosure suit, they were not content to lot it proceed to decree and sale without they were,
 
 in- advance,
 
 relieved of personal responsibility. Bailey & Co. would, not release them, and they endeavored to find some person who would purchase the Bailey claim, with its col-laterals, and discharge them from liability on their notes. This would have been well enough, if the scheme had embraced only the $42,000 bonds held as collaterals, which-the company justly owed, and the foreclosure suit was brought to enforce. But the scheme went much further; for these directors, who controlled the corporation, in their selfish desire to save themselves at the expense of their own reputation and the rights of creditors, were willing to use the
 
 *304
 
 means at their command to swell the indebtedness of the road beyond its true amount, in order to aid more effectually Cross and his associates to acquire all the property of the company.
 

 If Cross & Co. had been satisfied tvith the transfer of the $42,000 bonds, which constituted the true indebtedness against the road, in the hands of Bailey & Co., the transaction on their part would have berni free from censure; but the certain attainment of the object they had in view required more bonds. It was very clear that bidders might appear, if the road was to be sold for no more than the face of these bonds, while they would be deterred from attending a sale where the sum to be made was over $300,000. To bring the decree, therefore, up to a point at which competition would be silenced, it became necessary to use the bonds in the hands of Jesup & Co. Two hundred and eighty thousand dollars in the bonds of an insolvent corporation— constituting no indebtedness against it — -are thrust, unasked, into the hands of creditors, for the ostensible purpose of furnishing them additional security, when,
 
 at the
 
 time, they were negotiating a sale of the debt to be secured for $7000 less than its fáce. But the transfer to Bailey & Co. was a mere pretence. To preserve a semblance of fairness in the business, the bonds had to come through Bailey & Co., but the real purpose was not to help them, but to aid Cross and his associates to absorb the whole road — and this these directors were willing to do — when the debt they were struggling to escape could be paid for $13,380.20, and the very iron in the road-bed, for which the debt was incurred, was worth over $20,000.
 

 It is claimed that the sale at the Milwaukee. Exchange, assented to by the corporation, conferred rights on the purchasers of the bonds which cannot be successfully attacked; but this claim is based on the idea that the sale was for an honest purpose, when, in fact, it was only part of a previously concerted plan to accomplish a fraudulent purpose, The ceremony of this sale was a cheap way of showing honesty and fairness, for it was very evident that an adver
 
 *305
 
 tisement to sell a large amount of the bonds (having no market value) of an insolvent and abandoned railroad corporation would never attract the' attention of capitalists.
 

 The scheme to acquire the property of this corporation was, in its inception, fraudulent, and every step in the progress of its execution was necessarily stamped with the same character.- . There is nothing in this record to mitigate the conduct of the defendants, who purchased the Milwaukee and Superior Railroad. They knew the road was abandoned, the company insolvent, the complainants unpaid for property then in the possession of the corporation, and yet they combine with timid and unfaithful trustees to get not only
 
 this,
 
 but all the property of the corporation, and adopted a plan to carry out their project, which resulted in raising the decree to an extent that would necessarily prevent all fair competition. The fruits of such an adventure cannot be enjoyed by the parties concerned in.it.
 

 There are other features in this case which provoke comments, but we forbear to make them.
 

 Cross,Luddington, and Scott purchased the entire railroad, locomotives, cars, and franchises of the company, for about $20,000. Subsequent to the sale, they stripped the road-bed of iron, ties, spikes, and chairs,-which, with the locomotives, cars, and fencing, they sold to various parties, and realized from.the sales a large- sum of money; but how much, the evidence is so singularly loose that we are unable to tell. On account of the want of certainty on this point, the case will have to be sent back, and referred to a master to take proofs, who will also ascertain aud report the value (if there be any) of the franchises of the company which Cross & Co. still retain.
 

 Cross, Luddington, and Scott must be held liable as trustees to the complainants for the full value of the property they purchased on the sale of the road, after deducting the amount due at the' day of sale on the Bailey judgments against the .directors, which amount they will be allowed to retain.
 

 
 *306
 
 They must also be charged with interest on the balance found due the complainants, from the day of the sale to the day of the final decree in this suit.
 

 The decree 'of the Circuit Court is reversed, and the cause remanded, with directions to proceed in conformity WITH THIS OPINION.