[No. 736.    October 2, 1897.]

## THE SANTA FE ELECTRIC COMPANY et al., Appellants, v. CHARLES C. HITCHCOCK, Appellee.

MORTGAGE—GOOD WILL.—The mortgage of the entire assets of a business can not be construed to include its good will, in the absence of any conveyance of the good will either expressly or by fair implication.

ID.—CORPORATIONS—LEASE—MERGER—FRAUD.—Where a majority of the stock of an electric lighting company was purchased by persons, who became directors, assumed control of the company and formed and became directors of a new company, under their control, the purpose of both being to furnish light; and the directors of the new company by virtue of their position in the old, obtained a lease of all the poles and wires of the latter, so that its plant and machinery could not be operated, the former retaining power to terminate the lease at any time, but binding the old company not to terminate it for eighteen months, a mortgage having been given, before the establishment of the new company on all the property of the old, which had become much depreciated in value; the president of the new company testifying that, but for the mortgage, the two companies would have consolidated —Held: Conclusive evidence of fraudulent combination to defeat the mortgage.

ID.—CORPORATIONS—LEASE—MERGER—LIABILITY OF NEW COMPANY— AFTER ACQUIRED PROPERTY.—A lease by one corporation to another of all its poles and wires, so that its plant and machinery could not be operated, was a sufficient merger into the other to render it liable for the debts of the former; but the merger did not render the property of the new company an accretion of the old company, so as to fall within a mortgage on the entire assets of the latter including all after acquired property.

*Appeal*, from a decree for complainant, from the First Judicial District Court, Santa Fe County.    Modified and remanded, with directions.

The facts are stated in the opinion of the court.

EDWARD L. BARTLETT and EUGENE A. FISKE for appellants.

"The equitable lien of creditors of the old company upon its property would continue until after a transfer to a purchaser for value; but they would have no equitable lien upon the assets of the new company and would have no right to rank as its creditors."    Morawetz Corp., sec. 811.    See, also, Id., sec. 812.

It is only after a mortgagee has foreclosed his mortgage in equity, and finds that the proceeds are insufficient to pay the mortgage debt, that he has any remedy against one who has unlawfully acquired property covered by the mortgage; and then his remedy is at law, and not in equity, and his measure of damages is not the full amount of the unpaid indebtedness due him, but only the difference in value of the mortgaged property with or without the property so alienated. Heath v. Hale, 24 S. E. Rep. (S. C.) 300, 303, 304; Lavenson v. Soap Co., 22 Pac. Rep. (Cal.) 184; Heitkamp v. Granite Co., 59 Mo. App. 244.

The capital stock in the old company, subscribed for and not paid in full, is an asset of the old company, if that company be insolvent, and creditors may call upon that asset to pay any deficiency that may arise after a sale of the mortgaged property.    2 Morawetz Corp., secs. 820, 821; Hatch v. Dane, 101 U. S. 205; Upton v. Triblecock, 91 Id. 47; Sanger v. Upton, Id. 60, 61.

GEORGE W. KNAEBEL for appellee.

The electric system and its additions, including all the present and future property, business, custom, good will, etc., described in the mortgage, were in the hands of the Santa Fe Electric Company, its officers and directors, as a quasi trust fund, to be administered for the benefit of the stockholders and creditors of that corporation, and the subsequent fraud has not destroyed the trust.    On the contrary, the fraud has enlarged the trust fund.    Jones v. Mechanical Co., 38 Ark. 25; Wood v. Dummer, 3 Mason, 312; Curran v. Arkansas, 15 How. (U. S.) 308; Drury v. Railroad Co., 7 Wall. 299; Abbott v. Hard Rubber Co., 33 Barb. 578; 1 Story Eq. Jur., sec. 323; 8 Am. and Eng. Ency. of Law, 1371; Willett v. Blanford, 1 Hare, 270; 2 Pom. Eq., sec. 1070; 1 Perry on Trusts, sec. 427; Morawetz on Priv. Corp., sec. 810; Insurance Co. v. Transportation Co., 13 Fed. Rep. 516; 1 Beach on Priv. Corp., secs. 326, 327, 360; 1 Reid Corp. Finance, secs. 182. 213-215, 521; Jackson v. Ludeling, 21 Wall. 616; 1 Thomp. Com. Corp., sec. 332; 5 Id., sec. 6547.

By the express terms of the mortgage it is made to embrace future acquired property, and all accretions and accessional subject-matter.    3 Am. and Eng. Ency. of Law, Title "Confusion," 660; Id., Title "Accession," 50, 58; Story on Bail., sec. 292; Diversey v. Johnson, 93 Ill. 547; Southworth v. Ishing, 3 Sandf. 448; Ex parte Ames, 1 Law Dec. 361; Jenks v. Coffee, 1 R. I. 511; Hamlin v. Gerrard, 72 Me. 62; Galveston R. R. v. Cowdrey, 11 Wall. 482; 3 Pom. Eq.    See, also, as to decree for a contingent deficiency, Equity Rule 92 (U. S. Sup. Ct.) relating to territorial courts.

COLLIER, J.—The appellee, Charles C. Hitchcock, filed his bill of foreclosure on April 23, 1895, against the Santa Fe Electric Company and the Santa Fe Gas & Electric Company, two domestic corporations, and the Illinois Trust & Savings Bank, a foreign corporation, with no resident agent in the territory upon whom service might be made.    The domestic

corporations appearing, pleaded to the suit, and service by publication is claimed to have been sufficiently made as to the foreign corporation by publication; and, it not appearing, a decree pro confesso was entered as to it prior to the final decree made in behalf of appellee in the court below against all of the defendants.    The bill is for the foreclosure of a mortgage executed by the Santa Fe Electric Company to secure its promissory note given to appellee for the sum of $5,000, with interest at 12 per centum per annum, upon which default in payment of interest had been made, and an election made by appellee to consider the entire sum due, as provided.    The property covered by the mortgage was specific parcels of real estate, future to be acquired property of every description, "all the tolls, incomes, issues and profits arising out of said property, and its (the mortgagor's) franchise or franchises, its wires, poles, materials, coal, wood and property of every kind and description, real, personal or mixed, whether as lessees or holders or owners of the stock or bonds of any other corporation or corporations, association or associations, or however such interest of the Santa Fe Electric Company may be regarded in law or in equity as subsisting or inhering in the aforesaid premises and property, or any part or parts thereof." All after acquired property, etc., shall inure by way of accretion to the benefit and advantage of appellee and his assigns by way of further and better security.    The Santa Fe Electric Company (hereafter to be called the "old company") was on October 18, 1893, a corporation engaged in the business of generating and distributing electric light to the inhabitants of the city of Santa Fe, at which time it executed the note and mortgage in this suit, and had at that time its plant, system, and customers as a going concern, and paid interest on said note up to October 18, 1894, making default in payment of further interest prior to the bringing of this suit.    The evidence showed the property embraced in the deed of trust was worth about $16,000.    The Santa Fe Gas & Electric Company (hereafter to be called the "new company") is joined as a defendant in this suit, upon the theory that it is an extension

and enlargement of the old company, and that all of its plant and system comes under appellee's mortgage, "by way of accretion to the benefit and advantage of appellee and his assigns," just as if the same extension and enlargement had been made by the old company.    The Illinois Trust & Savings Bank is joined for the purpose of establishing the priority of appellee's mortgage over that given by the new company to said savings bank as trustee.    Appellants offered no evidence, and claimed no case was made by appellee under the proof.

The facts of this case are substantially as follows:    The old company was, at the time it executed the note and mortgage in suit, the owner of the parcels of real estate described in the mortgage, and was using the improvements constructed thereon in carrying on its business, and this real estate and improvements had their principal value as being so used.    It also had its machinery, consisting of dynamos and other electric apparatus in its power house, and its polls and wires and customers, being in the full occupancy of a field which the proof shows was not sufficient for two concerns of its nature to do business in.    The business does not appear to have been profitable, but during the period of several months prior to November, 1894, its financial condition improved, so that its assets appeared to be sufficient or likely sufficient to discharge the obligation it was under to appellee, it being the only lien thereon. In August, 1894, the new company was organized, with Samuel H. Day, Percival B. Coffin, Edward L. Bartlett, Charles H. Coffin and Julius M. Howells as its directors, all of whom continued as such directors until after the filing of the bill in this cause. Day was made president, and he and Howells were the active men of the board, Howells acting on behalf of the Municipal Investment Company of Chicago, subscriber to 996 shares of the total of 1,000 shares constituting the capital stock, in which interest were also the two Coffins.    Howells, Day and the Coffins were at this time interested in and connected with the Water & Improvement Company at Santa Fe, and the new company, it was contemplated, would be a most valuable customer of the water company, and did so become,

in the sum of $300 per month, in the furnishing of water power for the generating of electricity, while the old company, under what was denominated its more expensive process, used coal, and could never become such a customer.   The plan, as stated by Day in his testimony, was to combine the conflicting interests of the old company and the gas company, also furnishing light in Santa Fe, by the organization of a new company, which was to be a customer of the water and improvement company.   Day and Howells proceeded between August and November, 1894, to acquire the stock in the gas and old electric company, paying cash straight out for some, and part cash and stock in the new company for the remainder, representing that the purpose also was to pay the debts of the old companies, believing in this way the good will of those to whom they would look for custom would be secured.   Creditors were to be offered stock in the new concern, and, if the plan completely succeeded, the old company was to go entirely out of existence, in name as well as in fact.   Appellee, however, would accept nothing but cash for his obligation, and Day says:   "It blocked the scheme, and we were unable to carry it out as fully and completely as we desired to do, for the reason that this mortgage had to be disposed of in some way, and for that reason the two organizations have been continued, in fact, as they have always been, as separate organizations, until to-day."   He also says:   "Mr. Howells was the moving spirit, as the inventor of the scheme, the originator of it here, and his backers in Chicago were the Municipal Investment Company."   Having acquired a large majority of the stock of the old companies prior to the stockholders' meeting in November, 1894, Day and Howells caused themselves to be elected its directors, in a board composed of themselves, E. A. Fiske, C. W. Dudrow, and H. B. Cartwright.   E. A. Fiske was made president, and S. H. Day the general manager; and on December 1, 1894, they took charge of the affairs of the old company, with P. B. Coffin as secretary and treasurer, who, as treasurer, gave bond, with Charles H. Coffin and J. M.

Howells as his sureties, and S. H. Day also produced, as sureties on his bond as general manager, the same persons. The two companies now had S. H. Day for general manager, and P. B. Coffin for treasurer, and S. H. Day and J. M. Howells directors. There was from this time but one office for the two companies, and in the carrying on of the business professedly in the name of the old company up to April 1, 1895, and in the payment of old indebtedness other than the mortgage indebtedness, the Municipal Investment Company advanced to the treasurer of the old company about $2,000. In anticipation of the new company being ready to begin operations, a lease was made to it by the old company on March 4, 1895, of all its poles and the wires, fixtures, and apparatus for the distributing and supplying of electric light, at the rate of $100 per annum, the rental to begin from the date of the execution of the lease. The new company acquired full and uninterrupted use of, and the right to use, all such poles, wires, etc., for the purpose of conducting, supplying and distributing electric light and power to any and all points and places, etc., "with full right and power to use and operate the said business under the franchises of" the old company. This lease does not bind the new company to continue to pay rental for any specified time, however short, but only "for such time as the said party of the second part may desire the same;" but the old company can not terminate the lease under a year, and only then by notice given after the year, to take effect not earlier than six months. Notwithstanding this lease took effect on March 4, 1895, the poles, wires, etc., continued to be used in the business carried on in the name of the old company until connection was made, on April 1, 1895, with the power house of the new company. At this time, without any prior arrangement having been made with any of the customers of the old company other than the city of Santa Fe, or between the two companies, so far as the record of action by the board of directors shows, the business of the old company was carried on by the new, and has been ever since. On April 16, 1895, the officers of the old company, as its minutes recite, report that "the

Santa Fe Gas and Electric Co. have secured the contract for lighting the city for the year beginning April 1, 1895, and have also made contracts with many of the largest customers of this company.   The Santa Fe Gas and Electric Co. is operated by water power, which is cheaper than power produced from coal.   In view of the above facts, and with the certainty that in the future the company must be operated at a heavy loss, the officers thought it was to the best interests of the company to close down the plant for the present, and they report that they have therefore closed down the same, and have discharged its employees."   The minutes report that, after full discussion of the report of the officers, their action was unanimously approved.   At this meeting there were present S. H. Day, E. A. Fiske, H. B. Cartwright, directors, and P. B. Coffin, secretary.   The bill does not specify any particular property as subject to the lien of the mortgage other than such as is described therein, nor does the evidence identify the alleged accessional property, further than as extension and enlargement, the additional real estate being in no way described.   It should also be stated that the lease provided for the new company detaching and taking away all the poles, wires, fixtures, etc., which it shall construct and attach to the leased property.

A clear understanding of the case seems to demand a somewhat lengthy statement of facts, such as we have given.

MORTGAGE: good will.

It is claimed by appellants that the case of the Metropolitan Bank v. St. Louis Dispatch Co., 149 U. S. 436, is decisive of this case, in favor of the Santa Fe Gas & Electric Company, called in the statement the "new company." The case referred to was where the complainant, holding a first mortgage on a newspaper plant, sought to make it cover an entirely new plant, not described in the mortgage.   The facts of that case were that the plant described in the first mortgage was sold under a second mortgage, and a grantee of the purchaser, in the course of time, substituted one part and another of the machinery of the plant originally received, so

that at the time the note secured matured, none of the original presses, type, and property described in the mortgage were in existence. The court said: "The bill was not framed on the theory of holding the defendant for the value of the mortgaged chattels on the ground of wrongful conversion, nor was it charged that there was any wrongful intermingling of the original plant with that subsequently acquired, either by the mortgagor or the purchaser under the second mortgage or his grantee. The allegation was that the machinery, type, presses and property of a perishable nature had been alienated or destroyed or gradually used up. This was done in the course of business, and as the plant on hand at maturity of the note was an entirely new plant, not described in the mortgage, we think the mortgage could not be extended to it on the theory of willful intermingling. The clause in the first mortgage in relation to after-acquired property was an executory agreement for the performance of which the mortgagee might recover compensation in damages as against the mortgagor; but, as against the grantee of the purchaser at the sale, the lien of the mortgage could not embrace what had no existence when it was given, and was not acquired by the mortgagor; and, if such grantee was liable at all, it would be for conversion of existing property." The court appears to avoid saying that it would not subject all accretions resulting from a wrongful intermingling which could not be separated without injury, and argues to show this case does not come under any such rule. It is unnecessary, however, to further discuss that case, as we do not think this case is one of intermingling. From the evidence we think it could be ascertained what were the poles, wires, and apparatus covered by the mortgage, and, if there was any intermingling, it was that of the business of the old with that of the new company. If the principle of intermingling business should have effect, it must be on some other theory than that of mere capture or conversion of business. Business is a tangible thing, just as poles and wires are tangible things. The value can be proved, and for its destruction a remedy at law is adequate. If there were the

element of good will in this case, it would present a different question.    In Metropolitan Bank v. St. Louis Dispatch Co., supra, good will is said to be "tangible only as an incident, as connected with a going concern or business having locality or name, and is not susceptible of being disposed of independently."    We have carefully read the mortgage of complainant to find therein any conveyance of good will, but discover no language expressly or by fair inference to such effect.    We know of no rule that makes the mere mortgaging of the entire assets of a business also the mortgaging of its good will.    In the case of a lease of a business, such a rule might obtain without it being expressly stated, but not so with a mortgage of assets.

The decree of the court below, in the form it is made, can be sustained, if at all, upon one proposition, viz., that the transaction whereby the business of the old company has come to be carried on in the name of the new company made no legal change in the status so far as complainant is concerned. The testimony can not be carefully read in this case without its producing in the mind a conviction that fraud was perpetrated upon complainant.    There can be no reasonable doubt that, but for the interference of the new company, the assets of the old could have been made to satisfy complainant's claim, being the only lien.    We find many cases where sales are set aside because of the fraudulent conduct of the directors of corporations, and declaring that the purchasers at such sales are liable as trustees to the extent of the property they received. Such are the cases of Jackson v. Ludeling, 21 Wall. 616; Drury v. Cross, 7 Wall. 302; James v. Railroad Co., 6 Wall. 752; Wardwell v. Railroad Co., 103 U. S. 651. These cases are useful as showing how severely the law condemns such acts as were resorted to in this case, and we quote from the last above cited the language of Justice Field:    "It is among the rudiments of the law that the same person can not act for himself, and at the same time with

CORPORATIONS:
lease: merger:
fraud.

respect to the same matter as the agent of another, whose interests are conflicting. The law, therefore, will always condemn the transactions of a party on his own behalf when, in respect to the matter concerned, he is the agent of others, whenever their enforcement is reasonably resisted. Directors of corporations and all persons who stand in a fiduciary relation to the other parties, and are clothed with power to act for them, are subject to this rule. They are not permitted to occupy a position which will conflict with the interest of parties they represent and are bound to protect." That one should, in one or more fiduciary capacities, attempt to represent conflicting interests, is no less repugnant to the law than where his own interests is in one scale and that of his principal in another. Generally the result of such a doctrine is that the recipient of property obtained by the aid of faithless agents is held to be trustee of, and accountable for its full value to, the person defrauded, and if he has intermingled it with his own, so that it can not be separated, loss falls on the recipient.

The bill, however, and the decree, in this case, do not stop at this result, nor at the result that the offending recipient shall respond in this suit for the depreciation inflicted on appellee's security, nor that he shall be held to have assumed to pay appellee's debt, but that also the lien of appellee's mortgage is extended over all of the recipient's property under the mortgage clause of after-acquired property. We think that, if either of these three results follow, the bill is maintainable —the two former because of the *nexus* of fraud as to or about the subject-matter of equitable cognizance in the foreclosure proceeding, relief being grantable under the prayer for general relief. The lease executed by the old company to the new company is, upon the principle laid down in the authorities and the facts we hereafter refer to, conclusive evidence of fraudulent confederacy between the governing officers of the two companies. Thus, in Abbot v. Rubber Co., 33 Barb. 579, it is held that directors, even with the consent of the majority of the stock-

*Margin note:* Corporations: lease: merger: liability of new company: after-acquired property.

holders, had no right to make a sale of the entire property of a corporation, except of its real estate and machinery and fixtures, against a dissenting stockholder.    In the argument, the court says this is also true as to a dissenting creditor.    The court said that "directors of a corporation are agents of the corporation to manage its affairs, and carry out the purpose of its organization, and not to inflict on it political death.    They are only authorized to do such things as are expressly or impliedly directed or authorized by the charter."    What less did this lease accomplish?    With its poles and wires in the possession of the new company, the business of the old company and its power house, with machinery, was, as is said in the "Rime of the Ancient Mariner," "as idle as a painted ship upon a painted ocean."    Who doubts that thus it was intended to be?    Day says:    "It blocked the scheme, and we were unable to carry it out as fully and completely as we desired to do, for the reason that this mortgage had to be disposed of in some way, and for that reason the two organizations have been continued."    This is as frank as was futile the unanimous approval, by three directors of the old company, of the officers' acts in closing down the works when the company had no wires or poles to distribute its light, two of these three being the officers.    The transparency of this deception as a business proposition is also shown by the acts of both of the contracting parties.    Thus, the new company was paying for the poles, etc., for four weeks before it could use them with its power house, and while the old company was using them, and the old company gave the new company the right to return them at any moment it chose, but could not take them back under eighteen months.    "The scheme to acquire the property of this corporation was in its inception fraudulent, and every step in the progress of its execution was necessarily stamped with the same character."    Drury v. Cross, supra.    This language only needs to be changed by inserting for "in its inception," the words "from the time they could not settle with Hitchcock."    Did this amount to a consolidation?    "A lease may amount to a consolidation, and consolida-

tion has frequently taken the form of purchases by one corporation of the shares of another." Beach, Priv. Corp., sec. 326. "Where an old corporation sells out to a newly-organized one, and turns over all of its property, the new company becomes liable upon the debt and contracts of the old." Id. sec. 360. What lease could there be more amounting to a merger of one corporation into another than this, as this stripped the old company of life, as was fraudulently intended? We find in Hibernia Ins. Co. v. St. Louis & N. O. Transp. Co., 13 Fed. Rep. 516, the following language: "The sale by the Babbage Company of all its property to another corporation, composed mostly, if not wholly, of the same persons, was fraudulent and void as to all the creditors of the former company not assenting thereto. The purchaser knew that it was buying all the property of the seller, and that, by the transaction, the latter was deprived of the means and power of meeting any of its outstanding obligations. The fair inference from the transaction was that the old company was about to be dissolved, and to cease to be. It was to be absorbed by the new company. This was the inevitable consequence of the formation of the new company, composed substantially of the same persons, to transact the same business, at the same places, and with the same property. By the transfer, the creditors of the old company were deprived of the means of enforcing their claims." Instead of "all its property" say "property essential to enable it to do business," and for "Babbage" say 'Santa Fe Electric," and for "sale" say "lease," and scarcely another word need be changed, except the case could be more strongly stated in that the fraud here was directed singly and only against appellee. The stockholders of the old company came into the new, the officers and offices were the same, the business the same, and appellee is deprived of the means of enforcing his claim, if the testimony as to depreciation is true.

The testimony, uncontradicted, as to value, is that the plant was worth $16,000; and, as confirmatory of that theory, the new company, or at least the owner of three-fourths of the stock, caused Howells, the director of both companies, to pay

forty cents on the dollar in cash, or twenty cents in cash and the remainder in stock in the new company, for stock in the old company, which tends to demonstrate a value over and above, not only the mortgage, but all other indebtedness. We do not think any of the authorities go to the extent of this mortgage over the plant, etc., of the new company, but the fraud shown in this case gives jurisdiction for a court of equity to proceed to a disposition of all matters relating to the subject-matter of its cognizance. As it has been reasonably well proven that, without this fraudulent intervention on the part of, and collusion between, the officers representing both the old and new companies, appellee could have made his money out of the property covered by his mortgage, appellee should proceed to sell the property embraced in the mortgage, and, the amount realized from the sale being reported to the court, a deficiency decree should be rendered against both the old and the new companies for the remainder. This case is remanded to the lower court, whence this appeal came, with directions to proceed in conformity with this opinion —that is to say, a decree will be entered in this court directing said court to enter a decree therein modifying the decree appealed from, so that appellee may have his decree of foreclosure against the appellant the Santa Fe Electric Company as to all the property embraced in the deed of trust given by it to the appellee, and providing for the sale thereof; and, further, if it shall appear that, upon a sale thereof, a deficiency remains to be paid upon the decree as heretofore entered, that a deficiency decree be entered against the said Santa Fe Electric Company and the Santa Fe Gas & Electric Company, together with the sureties upon the appeal bond given in this cause, to the extent of said appeal bond, or so much thereof as may be necessary; and that the said decree be in all other respects affirmed, except that the said deficiency decree shall not be taken as prior in lien to the deed of trust given by the said Santa Fe Gas & Electric Company to the said Illinois Trust & Savings Bank, with costs of this appeal to be paid by each party, respectively, as incurred; and the decree to be entered

in this court shall provide that in further proceedings in the district court said court may enter and make all orders, interlocutory or final, as may be necessary in furtherance hereof.

Smith, C. J., and Hamilton and Bantz, JJ., concur.