[Civ. No. 805.   Third Appellate District.—June 9, 1911.]

ELLA B. PIERCE, Appellant, v. FRANCES P. PIERCE, Respondent.

MORTGAGE—CONSIDERATION—REGULAR FORECLOSURE—TITLE—IMPROPER ANNULMENT FOR ALLEGED FRAUD OF MORTGAGOR—DIVORCE.—Where a mortgage, executed by a son to his mother, was for a full money consideration advanced to the son by the mother, and her proceedings for the foreclosure thereof, under which the legal title to the land was acquired by her, were legal and regular, the decree of foreclosure cannot be set aside by the court at the instance of the divorced wife of the son, on the alleged ground that the title was collusively and fraudulently vested by the son in the mother, to conceal his property, in anticipation of his commencing a divorce suit against her, in which she obtained a divorce by cross-complaint.

ID.—DEED OF GIFT BY MOTHER TO SECOND WIFE OF SON—FORMER COMMUNITY PROPERTY—POVERTY OF DIVORCED WIFE—ALIMONY.—The deed of gift by the mother, after foreclosure, to the second wife of the son, vested the legal title in her, which is unassailable, notwithstanding the poverty of the divorced wife, and a judgment for alimony against the son, and the fact that the whole community property has thus become vested in the second wife.

Id.—RULE AS TO COLLUSIVE LEGAL PROCEEDINGS—INVALIDITY AS TO CREDITORS.—The rule as to collusive legal proceedings which are invalid as to creditors of the mortgagor applies only where there is fraud and collusion in the proceedings themselves whereby a security is sought to be enforced.

Id.—MERE MOTIVES IMMATERIAL.—The law cannot attempt to control the mere motives of men in their dealings with one another, in the absence of fraud. Motive, though it may be an important element of fraud, does not alone vitiate a conveyance, nor preclude the assertion of a valid claim.

Id.—PURPOSE OF CODE SECTION AS TO FRAUD UPON CREDITORS—INAPPLICABILITY TO ENFORCEMENT OF VALID LIEN.—The purpose of section 3439 of the Civil Code, prohibiting "every judicial proceeding taken with intent to delay or defraud any creditor or other person of his demands," is manifestly to prevent any fraudulent change in the situation of the property that would prejudice the rights of persons holding claims against the debtor. But that section cannot reasonably be held to apply to the enforcement of a valid existing lien upon specific property where every requirement of the statute is complied with, and no element of fraud appears in the proceeding to enforce the lien.

Id.—FINDING AS TO CONCEALMENT OF PROPERTY IN ANTICIPATION OF DIVORCE AGAINST EVIDENCE.—It is held that the finding of the court in reference to the concealment of the property in anticipation of the action for divorce is against the evidence, there being no proof that the mother had any knowledge or intimation as to the future intentions of her son when the foreclosure suit was brought and the legal title of the son obtained under the foreclosure of her valid mortgage, or at any time within sixteen months thereafter. The fact that the property was encumbered for more than value is persuasive evidence that there was no intention of concealing the title by foreclosure.

Id.—MOTIVE TO PREVENT SUIT FOR MALPRACTICE.—The fact that one of the motive considerations in securing the foreclosure of the mortgage at the time when it was foreclosed was to prevent a possible suit for malpractice against the mortgagor, as a physician, cannot affect the validity of the foreclosure, where there is nothing to show that there was any demand existing in a legal sense against him, and no question was made as to the *bona fides* of the mortgage, and the assured title which such a foreclosure would give to the mother as mortgagee.

Id.—FINDING OF ULTIMATE FACT AGAINST EVIDENCE—REVERSAL.—Where the finding of an ultimate fact is against the evidence, and it is not controlled by sufficient probative facts, the judgment cannot be properly awarded upon the findings in favor of the appellant, but the judgment and order denying a new trial to the appellant must be reversed.

APPEAL from a judgment of the Superior Court of Tulare County, and from an order denying a new trial.   W. B. Wallace, Judge.

The facts are stated in the opinion of the court.

Campbell, Metson, Drew, Oatman & MacKenzie, Power & McFadzean, E. M. Rea, and Horatio Alling, for Appellant.

Will M. Beggs, E. C. Farnsworth, and R. C. McComish, for Respondent.

BURNETT, J.—For a statement of the facts and of the grounds of the decision as to the merits, we make the following quotation from the opinion filed in the 'cause by the learned trial judge: "This is a suit between the present wife and the former wife of Dr. Robert E. Pierce to quiet title to an orange grove of about thirty acres near Lindsay, and now worth at least $30,000. By a cross-complaint Dr. Pierce, his mother, Fannie L. Pierce, and his brother, Frederick B. Pierce, are made parties. Dr. Pierce became a practicing physician in 1879. One year later at his ancestral home in Melrose, Massachusetts, he was married to defendant, and they lived together for nearly twenty years, most of the time at San Jose, where Dr. Pierce still resides. The land in controversy was purchased with community funds about the year 1894. Defendant was in Melrose from July, 1897, for nearly two years, visiting the doctor's mother, having gone there, as defendant says, 'at his very urgent consent and wish.' It appears from the testimony of the mother, Fannie L. Pierce, that her husband in 1884 loaned Dr. Pierce $2,000 on his note. The father died about three years later leaving this note with other property to Fannie L. Pierce. Nine years after his death while the doctor was visiting at Melrose, in January, 1896, she loaned him an additional $2,000, taking his note for $4,000, and canceling the first note.

"Nearly two years later, November 29, 1897, Dr. Pierce executed a mortgage on the land in controversy to his mother to secure payment of a note for $4,000 of even date, due one year after date. The mortgage and the new note were prepared either in the brother's office in San Francisco, or in the office of Jackson Hatch, at San Jose. On February 10,

1899, suit in the name of the mother was brought against Dr. Pierce to foreclose this mortgage. The brother appeared as attorney for his mother. Summons was issued and received by the sheriff and served on Dr. Pierce the same day in Tulare county, there being mileage charged for only one mile, which shows that the doctor was at or conveniently near Visalia on that day. On February 21st, the doctor, not having appeared, his default was entered and the mother obtained a judgment against him for $4,603.30, including $250 attorney's fee. A decree of foreclosure was entered and on March 14, 1899, the land was sold to the mother for the amount of the judgment and cost of sale.

"Under the law the doctor had six months within which to redeem the property, but four days after the foreclosure sale, he conveyed the land and his equity of redemption to his mother, Fannie L. Pierce.

"Dr. Pierce testified that shortly after the foreclosure sale, he received a lease of the land from his mother through his brother for a term of from three to five years. This lease was not recorded or produced at the trial. In June, 1900, Dr. Pierce sued his wife for divorce, she resisted, filed a cross-complaint and was awarded the decree of divorce and alimony in the sum of $100 a month, and the alimony was made a lien upon this property. The records of this suit were burned in the fire following the earthquake in San Francisco, where the case was tried. From the decree, a copy of which was recorded in this county, it is evident that the property rights of the parties were put in issue and tried, and the doctor must have admitted the ownership as claimed, or permitted the ownership to be proved without objection.

"After the divorce was granted, down to 1902, the divorced wife saw Dr. Pierce very often at her home, where he would call upon her. He was friendly and affectionate in his greetings. Whenever she was ill, which was often, he prescribed for her as a physician. She frequently consulted with him about her business affairs. He appeared much interested in her welfare, and she still had great trust and confidence in him. Alimony was paid for a time, the last payment of $200 was advanced by defendant's father, he taking Dr. Pierce's note, which has not been repaid. Alimony was in arrears for about four years at the time of the trial.

Early in 1902 Dr. Pierce told his former wife that he had a
paper which he wished her to sign, and that he would send
it to her by his brother Fred. Soon afterward, on February
8, 1902, while she was ill in bed and preparing for a surgical
operation, which Dr. Pierce had advised, the brother, Fred
Pierce, took the paper to her and she signed and acknowl-
edged it. She says she was told that it was a lien, but did
not know what a lien was. Neither the doctor nor the
brother told her it was a release of her lien on the property,
and she did not discover that it was until the fall of 1906.
She did not read it, but signed it because the doctor asked her
to sign it. She knew nothing of the mortgage on the prop-
erty, nor of the foreclosure and sale, nor of the deed from
Dr. Pierce to his mother, nor of any lease from the mother
to Dr. Pierce until in October, 1906.

"In January, 1906, Dr. Pierce and plaintiff, Ella B.
Pierce, were married. Then, without consulting his mother,
Fred B. Pierce prepared and sent to her a deed, which she
executed on February 8, 1906, conveying this property to
Ella B. Pierce, whom she had never seen and with whom she
had never corresponded. This deed was recorded. No con-
sideration was received for it. The mother said it was a
present. The mother never saw the property, never asked
for the payment of the note, nor for any security, nor ever
authorized the foreclosure suit. Everything seems to have
been done by Fred Pierce and she but passively responded
to his suggestions." Attention is then directed to the fact
that, by various acts after the foreclosure, Dr. Pierce treated
the property as his own, and it is said to be "a reasonable
inference from the circumstances that Dr. Pierce urged his
wife to go east in July, 1897, with a view of putting the com-
munity property in a condition so that she would ultimately
be deprived of any interest in it and then to separate from
her and cause a divorce to be granted." The opinion pro-
ceeds: "The remarkable facts in this case have culminated
in a condition by which the community property of Dr. Pierce
and his former wife, now worth many thousand dollars, has
without any act or omission of hers, and without her prior
knowledge, become by gift apparently the separate and ex-
clusive property of the new wife, while she, the first wife,
is destitute and working as a stenographer for $40 a month

to support herself and her eighty-five year old father.'' The court concludes that it is not right, and that a just disposition of the cause is to set aside and annul the foreclosure proceedings, the deed from Dr. Pierce to his mother, the release of the lien for alimony and the deed from the mother to Ella B. Pierce, so far as it grants more than an undivided half interest in the lands and affects the lien for alimony; and to decree that plaintiff and defendant are owners as tenants in common of the orange grove and the profits heretofore made from it; that the land is subject to two liens—the mortgage lien which may be considered the property of the plaintiff, and the lien for overdue alimony, the property of the defendant, and that an accounting be had and the property sold and out of the proceeds the amount found due upon the accounting be paid, and after the payment of costs, the balance be divided equally between the plaintiff and defendant.

It is due Dr. Pierce to say that his brother, Frederick B. Pierce, who acted as his attorney, testified that he explained to defendant fully the said release of lien and that it was read to her at the time she executed it. The court, though, accepted her account of it rather than his. This, of course, the court had a right to do.

No doubt the court below took a humane view of the situation and, from a generous impulse, sought to relieve the distress of a woman that was believed to have been wronged and oppressed. It seems impossible, though, as we view it, to reconcile the decision with certain well-established legal principles.

The whole cause turns upon the finding of the court: ''That the said mortgage was made, executed and delivered for a valuable consideration paid to the said Robert E. Pierce, but that the foreclosure thereof was instigated and suffered, and the commissioner's deed thereunder permitted, by the said Robert E. Pierce for the fraudulent purpose on the part of the said Robert E. Pierce and the said Fannie L. Pierce of concealing the title of the said property from the creditors of the said Robert E. Pierce and particularly of concealing the title of the said Robert E. Pierce to said property in anticipation of commencing an action for divorce against the defendant and cross-plaintiff.'' That this is the gravamen

of the controversy must be apparent. If the mortgage and the foreclosure proceedings were legal and regular the complete title became vested in Fannie L. Pierce. This would be so without regard to Dr. Pierce's deed of his equity of redemption. It would necessarily follow that plaintiff succeeded to the entire estate in the property, as the deed to her is unassailable.

Assuming, therefore, that there was no infirmity in the steps culminating in the commissioner's deed to her, the deed from the said Fannie L. Pierce to Ella B. Pierce vested the title absolutely in plaintiff and the judgment of the court below was, of course, an unwarranted interference with her right. On the other hand, it may be said that, in connection with other findings of the court, the judgment can be upheld if the annulment of the said foreclosure proceedings can be justified. This vital finding, therefore, requires attention.

It is to be observed that there is no taint as to the mortgage itself. It was for a valuable consideration and the purpose of the parties in executing it is not impugned. Indeed, it is expressly found that "said mortgage was in all respects a valid lien on said land," but the foreclosure is set aside for the reason that the parties were moved thereto by fraudulent and improper motives. We must assume—and, indeed, the evidence shows it—that the money borrowed and secured by said lien was due and unpaid, that no legal step in the action of foreclosure was omitted, that the judgment decreeing the sale was according to the forms of law, that the sale was regular, that no one was prevented from bidding for the property, and that it was sold for its full market value. As a matter of fact, it appears to have been sold to the mortgagee for the amount of the judgment, which was in excess of the value of the land. Moreover, there was nothing to show that either party to the foreclosure had any reason to believe or did believe that the property would increase in value, the returns from it and the condition of the trees on the land indicating, to the contrary, that it would depreciate. If the judgment of foreclosure under these circumstances should be set aside, of course, it would follow that the mortgagee should not have attempted to foreclose her lien. The situation would then be this: For the reason that A desires to prevent C from realizing anything from a contingent interest in the

property, he is forbidden by equity to assert a perfectly valid claim against B in a perfectly legal manner, although, by forbearing to press his suit, it is probable that his security will be jeopardized and no benefit will accrue to C. This may be the refinement of morality, but it is not the principle upon which business is conducted, nor can it be enforced unless we are by law to attempt to control the motives of men in their dealings with one another. Motive, though an important element of fraud, does not alone vitiate a conveyance nor preclude the assertion of a valid claim.

In *Morris* v. *Tuthill*, 72 N. Y. 575, which was a suit to foreclose a mortgage, the court said: "The facts that the assignor of a mortgage and his assignee acted in concert with the view unnecessarily to harass and oppress the mortgagor and with intent to prevent payment, to the end that the equity of redemption might be foreclosed, and they become purchasers for less than the value, do not constitute a defense to an action to foreclose a mortgage. So, also, the facts that the assignee took title from motives of malice, and solely with a view to bring an action, and that the assignor assigned from a like motive and without consideration, furnish no defense and do not impeach plaintiff's title. It is sufficient to sustain the action that the mortgage debt is due, has been transferred to and is owned by plaintiff."

In *Dickerman* v. *Northern Trust Co.*, 176 U. S. 190, [20 Sup. Ct. Rep. 314, 44 L. Ed. 423], it is said: "If the law concerned itself with the motives of parties new complications would be introduced into suits which might seriously obscure their real merits. If the debt secured by a mortgage be justly due, it is no defense to a foreclosure that the mortgagee was animated by hostility or other bad motive." Therein reference is made to many analogous decisions by the supreme court of the United States holding, in a variety of cases, that the courts will not inquire into the motives of the parties. To the same effect are *Davis* v. *Flagg*, 35 N. J. Eq. 491; *McMullen* v. *Ritchie*, 64 Fed. 253; *Toler* v. *East Tenn. Ry.*, 67 Fed. 168.

But the claim is made that the case is brought within the inhibition of section 3439 of the Civil Code against "every judicial proceeding taken with intent to delay or defraud any creditor or other person of his demands." The purpose of

this statute is manifestly to prevent any fraudulent change in the situation of the property that would prejudice the rights of persons holding claims against the debtor. It would be rather a strained construction to hold that it includes the enforcement in the regular manner of a lien that had previously attached to the property. If there were any deceit practiced, or any advantage taken, or any substantial irregularity in the judicial proceeding, a different question would be presented, but it seems unreasonable to hold that the section applies to the enforcement of a valid existing lien upon specific property where every requirement of the statute is complied with and no element of fraud appears in the proceeding to enforce the lien.

The cases relied upon by respondent involve different circumstances, as will be seen upon an examination. They are cited in Cyclopedia of Law and Procedure (vol. 20, pp. 397–401) as authority for the text: "Debtors frequently attempt to cover up their property or transfer it in fraud of creditors by means of collusive and fraudulent legal proceedings; but it is well settled that such proceedings, however legal they may be in form, are void as against creditors, and the property so disposed of, real or personal, may be reached and subjected to the satisfaction of their claims"; and "A collusive and fraudulent sale under foreclosure of a mortgage or deed of trust on real or personal property, either under a power therein or by legal proceedings, will be set aside at the suit of creditors of the mortgagor or grantor." The former, though, refers, we think, to a fraudulent and not a *bona fide* claim, one that has the form, but not the substance and merit, of a valid charge against the property; and the latter contemplates fraud in the proceedings themselves whereby the security is sought to be enforced. This is shown in the cases cited, as far as they are in point at all.

In *Laflin* v. *Cent. Pub. House,* 52 Ill. 432, the trial judge had answered in the negative the following two legal propositions: 1. "Whether the act entitled 'An act to amend chapter IX of the Revised Statutes, entitled Attachments in Circuit Courts,' warrants an attachment on the ground of fraud in a sale under a chattel mortgage without fraud in the making of the mortgage"; and 2. "Whether a sale under a chattel mortgage, which, in matter of fact, hinders and delays

creditors, warrants an attachment under said act, on the ground that such sale is fraudulent in law, without a corrupt intent in the making of the sale.'' The supreme court, however, declined to pass upon the questions for the reason that the record was too incomplete and, therefore, the judgment was affirmed.

In *Milliman* v. *Eddie*, 115 Iowa, 530, [88 N. W. 964], the judgment on which the defendants relied was supported by no consideration. The supreme court of Iowa said: ''It was, in effect, a voluntary confession of judgment, and on an indebtedness which did not in fact exist, made for the sole and only purpose of hindering and delaying the creditors of the senior Goodmans, among whom were the plaintiff's grantors. . . . The transaction, from the beginning to the end, was fraudulent in fact, and void.''

The character of *James* v. *M. & M. R. R. Co.*, 73 U. S. 752, [18 L. Ed. 885], is seen in this statement from the syllabus: ''In a sale under a railroad mortgage, where the amount of bonds in the hands of *bona fide* holders were less than $200,-000, and the notice of sale set forth that the mortgage debt was $2,000,000, and that $70,000 interest was due, the sale could not be upheld without sanctioning the grossest fraud and injustice.'' ''This deceptive notice,'' as stated in the opinion, ''was calculated to destroy all competition among the bidders, and, indeed, to exclude from the purchase everyone, except those engaged in the perpetration of the fraud.''

*Drury* v. *Cross*, 74 U. S. 299, [19 L. Ed. 40], was a similar case. There the directors of a railroad company procured a mortgage to be foreclosed on the railroad for a much larger sum than was actually due, by fraudulent combination with the purchaser. It was, therefore, held that the purchaser must be held liable as trustee, to creditors, for the value of the property he purchased on the sale of the road, after deducting the amount due him at the day of sale. The court declared that ''The scheme to acquire the property of this corporation was, in its inception, fraudulent, and every step in the progress of its execution was necessarily stamped with the same character.''

In *Livesay's Exr.* v. *Bean*, 22 W. Va. 585, a deed of trust on lands and personal property with no definite fixed period at which a sale could be required, and which put it in the

power of the grantor, by collusion or otherwise, to indefinitely postpone a sale thereunder and put all the livestock conveyed by the deed and the increase thereof and all future crops to be raised from the land in the quiet enjoyment of the grantor, from which to support his family and pay the debts secured thereon as he might deem most advantageous, was held to be fraudulent on its face and void.

*Woodward* v. *Mastin,* 106 Mo. 324, [17 S. W. 308], was the case of a fraudulent and collusive sale for $300 of property belonging to an insolvent debtor and worth about $40,000. It is hard to see how the transaction could have been held otherwise than fraudulent and void.

In *Wright* v. *Mack,* 95 Ind. 332, a debtor in failing circumstances executed chattel mortgages upon all his property and stock in trade, of the value of $5,700, to secure sums in the aggregate of $1,400. It was held that the debtor had the right to secure the debts "to the exclusion or in preference of his other creditors and the mortgagees might lawfully accept such securities." But it was held that, on account of the irregularity and fraud in the subsequent proceedings participated in by the mortgagees, whereby there was a wrongful conversion of the property, the parties were liable to the general creditors for their damages resulting from such conversion.

*Hudgkins* v. *Kemp,* 61 U. S. 45, [15 L. Ed. 853], involved a fraudulent conveyance by a bankrupt. Among the indicia of fraud, it appeared that the land was worth double the amount of the purchase price and the possession and occupancy of the same remained unchanged. The evidence is reviewed in the opinion and held to impeach strongly the *bona fides* of the transaction between the grantor and grantee.

In all these cases the element of guile or subtlety or imposition attached to some overt act of vital importance to the parties. In none of them was there a lawful assertion in a lawful manner of a valid claim that had its origin in good faith for an adequate consideration.

But, if we consider the evidence, we find it insufficient to support the finding in reference to the concealment of the property and in anticipation of the action for divorce. There is no proof whatever that the mother had any knowledge of the doctor's domestic relations or any intimation of his in-

16 Cal. App.—25

tentions in that respect when the suit for foreclosure was brought, or at any time within the sixteen months that followed before the action for divorce was begun. There is nothing to show that she was influenced in the matter at all by any other motive than a desire to realize on her mortgage debt, which was past due. We can only surmise that the doctor had in mind the dissolution of the marital ties, as there does not seem to be any evidence of it. As appellant states it: "If there was anything in their relations prior to the divorce which would indicate the approaching final breach between them, the record is silent concerning it. So far as the record discloses, the bark of their domestic felicity sank suddenly in a windless, waveless sea. There was no warning note of the disaster for the ear of either friends or relatives, so far as the record shows."

It may be remarked that the circumstance that the property was encumbered for more than its value is persuasive evidence that there was no intention of "concealing" it by means of the foreclosure. There was no apparent reason for even an opinion that the property would more than satisfy the valid claims that had already become a charge against it, and it seems scarcely credible, under these circumstances, that the motive was otherwise than to subject the property to the payment of the debt. The law certainly did not require the parties to anticipate that the property might become more valuable, that there might be other claimants, and to forbear the enforcement of a valid lien until such time as the property might be valuable enough to satisfy all future demands. As to this point the only reply of respondent is that "The record shows conclusively that the foreclosure and subsequent proceedings were taken for the express purpose of defeating the rights of someone who was about to sue Dr. Pierce for malpractice." The only evidence in that connection is the testimony of Frederick B. Pierce, who said: "The mortgage was foreclosed because a short time before that the doctor was threatened with a suit for damages for malpractice in San Jose, and he wanted to have this property in such shape to protect my mother. He was willing to give me a deed rather than have the mortgage foreclosed, but at that time I wanted to keep the records straight, and as long as this mortgage was in existence and it was a *bona*

*fide* transaction, that it would appear much better if there was any question of consideration raised thereafter. I was the moving spirit in the foreclosure proceedings.''

But, granting that this was one of the motive considerations of the foreclosure, the answer would seem to be that it does not appear that this unknown person was a creditor of Dr. Pierce or that he had a demand in any legal sense against the doctor.

As we view the matter, the judgment on the findings should have been in favor of plaintiff.

The judgment and order are reversed, with directions to enter judgment for plaintiff.

Hart, J., and Chipman, P. J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on July 7, 1911, and the foregoing judgment was ordered modified in accordance with the following opinion then rendered:

BURNETT, J.—Respondent has called our attention to certain findings of the court below, which, it is claimed, would render a judgment for plaintiff unsupported. Among them is: "That it is not true that the claim of the defendant, Frances P. Pierce, is without any right whatever, or that she has no estate, right, title or interest in or to said land, or any part thereof; but on the contrary, defendant, Frances P. Pierce and plaintiff Ella B. Pierce are the owners of said property as tenants in common, subject to certain liens against the said property, as hereinafter more particularly set forth." We should treat this as the finding of an ultimate fact and not as a mere conclusion. It necessarily follows that it would preclude a judgment that plaintiff is the sole owner of the property. Notwithstanding the finding of certain probative facts shows that the foregoing ultimate fact was found against the evidence, the ultimate fact must prevail since it does not appear that the findings of the probative facts dispose of all the facts involved in the pleadings. (*Forsythe* v. *Los Angeles Ry. Co.,* 149 Cal. 575, [87 Pac. 24].)

We think, therefore, that our judgment rendered herein should be modified so as to simply reverse the judgment and

the order of the court below. It is therefore ordered that the following words be stricken from the opinion filed: ''As we view the matter, the judgment on the findings should have been in favor of plaintiff,'' and also that the following words be stricken from the judgment, to wit: ''With directions to enter judgment for plaintiff.'' The petition for a rehearing is denied.

Chipman, P. J., and Hart, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on August 7, 1911.