ANTHONY et al. v. CAMPBELL.

CAMPBELL v. ANTHONY et al.

(Circuit Court of Appeals, Eighth Circuit. November 25, 1901.)

Nos. 1,515, 1,516.

1. PLEADING—INTERVENTION—AMENDMENT OF PETITION.

An intervener who asserts in his petition a general lien, in favor of the class of creditors of whom he is one, on securities in the hands of a receiver of the court, may properly be permitted, in the discretion of the court, to amend his petition by alleging a specific lien in his own favor on certain of such securities, growing out of facts which were not known to him at the time he filed his original petition, and to rely upon both liens; the two not being inconsistent.

2. CORPORATIONS—SECURITIES DEPOSITED TO SECURE BONDS—FRAUDULENT SALE BY TRUSTEE.

A mortgage loan company which had issued debentures secured by a deposit of securities with a trustee was subsequently reorganized, and on the maturity of the debentures the new company undertook to retire the same by exchanging therefor new debentures of its own. The exchange was effected with all holders except one, who resided in Scotland, and who refused to accept the exchange. For the purpose of obtaining the securities held by the trustee, the new company made demand on the trustee, through one of its officers, for the sale of such securities; and the trustee sold the same at auction, sending a notice to the holder of the only outstanding debentures, which did not reach him, however, until six days before the sale, and too late for him to protect his interests. The trustee held securities of the face value of $255,000 and the actual value of about $175,000 which it sold to a representative of the new company for less than $16,000; the only money paid being the pro rata share which would accrue to the debentures which had not been exchanged, assuming that all were still in force, although in making the exchanges there was no understanding or agreement with the holders that the old debentures taken up should be continued in force for any purpose. *Held,* that the new company had no right to demand a sale of the securities, and that, as against the holder of the outstanding debentures secured thereby, such sale was fraudulent and voidable.

3. PARTIES—SUIT IN FEDERAL COURT—NONRESIDENT CORPORATION.

The securities so sold were deposited by the new company with another trustee to secure its own debentures, and in a subsequent suit by a holder of such debentures were taken into the possession of a federal court, by its receiver, for administration. In such suit the holder of the old debentures intervened, alleging the fraudulent character of the sale, and asserting his prior lien upon the securities. The trustee which had made the sale was a corporation of another state, over which the court could not obtain jurisdiction in such suit. *Held,* that the intervener had the right, at his election, to follow the securities, instead of bringing action against the trustee, and that, while the trustee would have been a proper party to the issue raised by the petition of intervention, it was not an indispensable party, and the court was authorized by equity

rule 47 to grant the relief prayed by the intervener, as against the other parties to the suit, without prejudice to the rights of the trustee.

**4. CORPORATIONS—SUIT BY BONDHOLDER TO SET ASIDE SALE OF SECURITIES BY TRUSTEE—LACHES.**

The intervener had been notified by the trustee of the sale of the securities at auction, of the price realized, and the portion thereof applicable on his debentures, and on the advice of attorneys employed in this country, based on statements made to them by officers of the new company that the securities sold were practically worthless, he accepted such sum from the trustee, and brought an action against the old company on his debentures, in which he recovered a judgment. Neither he nor his attorneys had knowledge until shortly before he set up such facts in his petition of intervention that the other debentures had been paid by exchange, that the sale was made at the request of the new company, that it had been the purchaser at the sale, or that the securities sold were of value. *Held* that, under such circumstances, he could not be held barred of the right to relief against the sale by laches, although the time fixed by the state statute within which an action for relief on the ground of fraud must be brought had expired before he filed his petition of intervention attacking the same; the statute further providing that the cause of action should not be deemed to have accrued until the discovery of the fraud.

**5. SAME—ESTOPPEL—RATIFICATION.**

Nor did the intervener ratify the sale, and thereby lose his right to relief against it, by his acceptance of a part of its proceeds, since he had at the time no knowledge of the facts which entitled him to impeach it.

**6. SAME—LIEN OF BONDHOLDER ON PLEDGED SECURITIES—EQUITIES OF OTHER BONDHOLDERS.**

A corporation issued 100 debenture bonds, secured by a deposit of securities with a trustee. It subsequently transferred all its property and assets to a new or reorganized corporation, which proposed to the holders of the debentures to exchange therefor debentures of its own, to be secured by a deposit with a new trustee of securities including those deposited by the old company. This proposition was accepted, and the exchange made by all the debenture holders except one who owned 4 of the bonds, and who refused to make the exchange. By a collusive sale made by the trustee the new company obtained possession of the pledged securities for a merely nominal sum, and deposited the same to secure its own debentures. In a subsequent suit a receiver was appointed for the company, who took possession of the securities. The holder of the 4 unpaid debentures of the old company intervened and obtained a decree setting aside the sale made by the original trustee as to him. *Held*, that as against the holders of the other bonds, similar to his own, who had surrendered the same in exchange for those of the new company with the understanding that they should be secured by a pledge of the same securities, he was not entitled to prior payment of his bonds in full from the proceeds of such securities, but only to 4 per cent. of such proceeds; it not appearing that the other holders had been parties to the fraudulent sale of the securities. Sanborn, Circuit Judge, dissenting.

**7. SAME.**

In such case, however, the intervener was entitled to 4 per cent. of all sums realized from the securities so wrongfully sold by the trustee, whether collected by the receiver or by the company previous to the receivership; the latter amount to be ascertained and paid from any funds of the company in the hands of the receiver.

**8. SAME—RIGHT OF CREDITOR TO ATTACK TRANSFER OF PROPERTY—LACHES.**

A creditor of a corporation which has transferred all of its property to another corporation, who proposes to challenge the validity of the conveyance, must act promptly after he is advised of the same; and a

delay of three or four years, during which others have become creditors of the transferee, and it has become insolvent, will bar his right to assert an equitable lien on the property so transferred.

Appeals from the Circuit Court of the United States for the District of Kansas.

These are cross appeals from a decree rendered by the circuit court of the United States for the district of Kansas in a case wherein L. W. Anthony is the complainant, and the Investment Trust Company and the City Real Estate Trust Company are the defendants, which action was commenced on May 2, 1896. Anthony held certain debenture bonds of the Investment Company, which were secured by certain securities, consisting principally of notes and mortgages, in the possession of the City Real Estate Trust Company, as trustee. The object of the proceeding appears to have been to obtain payment of the bonds held by Anthony, and of other bonds of a like character, by enforcing the sale or collection of the securities that had been deposited with the last-named company to secure their payment. On the filing of the bill, or shortly thereafter, three receivers of said securities were appointed, of whom B. R. Wheeler, one of the appellants, is now the survivor; the others having either died or resigned. At a certain stage of the proceedings Hugh Campbell, who is the appellant in case No. 1,516, intervened in said cause, asserting a prior lien on some of the securities in the hands of the receivers, adverse to the lien of the complainant in that action. At a later date, to wit, on November 21, 1898, Campbell filed an amended intervening petition. The decree from which both parties have appealed was entered on the intervening petition on September 29, 1900. By the terms of that decree, Campbell was awarded the sum of $1,968, with interest thereon from date, the same to be paid out of moneys in the hands of the receiver which had been realized from the securities aforesaid. He was also awarded the 1/25 part of such moneys as might thereafter be realized by the receiver from other of said securities not then collected. Anthony, the original complainant, and Wheeler, as receiver, who are the appellants in case No. 1,515, have appealed from that decree, alleging that the Campbell claim should have been rejected in toto. On the other hand, Campbell has appealed, alleging that the entire amount of his claim, namely, the sum of $12.278, should have been ordered to be paid out of the funds and securities in the hands of the receiver. The further facts on which the claims of the respective parties are based sufficiently appear in the opinion.

J. D. McFarland, for L. W. Anthony and Bennett R. Wheeler.
C. J. Evans (L. A. Stebbins, on the brief), for Hugh Campbell.

Before SANBORN and THAYER, Circuit Judges, and ADAMS, District Judge.

THAYER, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The record discloses that on November 1, 1888, the Kansas Investment Company, a corporation of that state, issued a series of debenture bonds amounting to £50,000, and, to secure their payment, deposited with the Boston Safe Deposit & Trust Company, hereafter termed the "Boston Company," certain securities, consisting of notes secured by mortgages on lands principally situated in Kansas, to an amount exceeding by 5 per cent. the par value of the debenture bonds. These debentures were sold in Scotland, and Hugh Campbell, the appellee in one of the cases, and the appellant in the other, became the purchaser of four of the debentures, each for the sum of £500, which by their terms matured on November 1, 1894. As the debentures were not paid at maturity, Campbell brought an ac-

tion and recovered a judgment against the Kansas Investment Company on November 27, 1897, in the sum of $10,621.52. After the issuance of the aforesaid debentures, and some time in July, 1890, the Kansas Investment Company transferred to the Investment Trust Company, a Colorado corporation, which is represented in this proceeding by Bennett R. Wheeler, its receiver, all of its property and assets, including its equity of redemption in the securities at that time held by the Boston Company, which had been deposited to secure the payment of the aforesaid debenture bonds. This latter investment company, which for convenience will be referred to as the "Colorado Company," appears to have been organized by the stockholders and officers of the Kansas Investment Company, most of whom exchanged their stock in the Kansas Company for stock in the Colorado Company; the purpose of the stockholders and officers being, apparently, to conduct operations in future under a Colorado charter, which would impose less liability on them as stockholders than was imposed at the time by the laws of Kansas. If there was a different motive in organizing a successor corporation under the laws of Colorado, we have failed to discover it. The securities that were thus transferred to the Colorado Company, consisting of notes and mortgages, and land mostly situated in Kansas, were of great value. The Colorado Company, after its organization, was controlled and managed by substantially the same persons who had previously controlled and managed the Kansas Investment Company, hereafter termed the "Kansas Company." Afterwards, during the years 1893 and 1894, the Colorado Company issued a large number of debentures, amounting in the aggregate to $2,500,000, and at the same time transferred the bulk of its assets, which also consisted of notes and mortgages, to the City Real Estate Trust Company, a Kansas corporation, as trustee, to secure the payment of its debentures. This latter company will be referred to hereafter as the "Real Estate Company." Its agreement with the Real Estate Company, whereby the latter was constituted a trustee, contemplated obtaining possession of the securities of the Kansas Company then in the hands of the Boston Company, and the transfer of the same to the Real Estate Company as security for its own larger issue of debentures. To accomplish this object the Colorado Company made a proposition to the Scotch debenture holders to exchange the debentures issued by the Kansas Company for the new debentures of the Colorado Company which were to become due on June 1, 1904. All of the Scotch debenture holders, except Campbell, consented to this exchange subsequent to November 1, 1894, when their debentures matured; and shortly thereafter they surrendered the old debentures of the Kansas Company to the Colorado Company, receiving in lieu thereof the debentures of the last-named company, which were termed "General Issue Debentures." Inasmuch as Campbell refused to accept the debentures of the Colorado Company, and insisted on payment of the debentures of the Kansas Company which were held by him, the Colorado Company was unable to obtain possession of the securities deposited with the Boston Company, and was unable to deposit them with the Real Estate Company as security for its "gen-

eral issue debentures," as it had contemplated doing. To overcome this latter difficulty, it resorted to the expedient of calling upon the Boston Company, as trustee, to sell the securities in its hands at public auction, on the pretense that such a sale was necessary to pay off and discharge the outstanding debentures of the Kansas Company, all of which, with the exception of the four held by Campbell, were then in its hands; the same having been taken up and retired with its own debentures. At the sale made by the Boston Company, as trustee, in pursuance of the request for such a sale, which emanated ostensibly from the Real Estate Company, but was made in fact by the Colorado Company, the securities were sold by the trustee on June 19, 1895, and were purchased by George C. Morrell for the sum of $15,600. After the sale of the pledged securities they were delivered by Morrell to the Real Estate Company, which occupied the same office as the Colorado Company, and was controlled by the same persons. The Boston Company received in cash for securities of the par value of $255,000 the sum of $612; that being the distributive share of the purchase money which was due to Campbell as the holder of four debentures, amounting to about $10,000. The trial court adjudged that this sale was fraudulent and void, and that it be held for naught, in so far as Campbell was concerned, and that the securities passed into the hands of the Real Estate Company and subsequently into the hands of the receiver of the Colorado Company, cumbered with a lien in favor of Campbell for the payment pro rata of the four debentures by him held. Anthony and Wheeler, the appellants in case No. 1,515, insist that this part of the decree is erroneous, which contention on their part presents the principal questions to be determined by that appeal. The propositions advanced by the appellants in support of this general contention that we deem it necessary to consider are as follows: First, that the trial court improperly allowed Campbell, the intervener, to amend his intervening complaint by alleging in such amended pleading that the sale of the securities by the Boston Company on June 19, 1895, was fraudulent and void; second, that the sale in question, in view of all the circumstances which attended it, was neither fraudulent nor voidable; third, that the Boston Company was a necessary party to a proceeding which was intended to challenge the validity of a sale made by that company as a trustee; fourth, that the intervener's right to the relief eventually granted by the trial court was barred by laches; and, lastly, that the intervener has ratified the sale in question, and for that reason cannot be heard at this time to question its validity. We will consider these propositions in the order in which they are above stated.

In support of the first proposition it is said that the intervener should not have been allowed to amend his intervening complaint so as to challenge the validity of the sale that was made by the Boston Company, since in his original complaint he failed to state any such ground for relief, but averred the existence of a general lien upon all of the securities in the hands of the receiver in favor of all the creditors of the Kansas Investment Company, growing out of the transfer by that company of all its assets to the Colorado Company

in July, 1890, under the circumstances heretofore stated. It is claimed, in substance, that because such a general lien was asserted in the original complaint the intervener had no right to mend his hold and to seek relief on other grounds. It will be observed, however, that the two grounds of recovery are in no wise inconsistent, since one asserts a general and the other a specific lien; also that relief might have been claimed for both reasons in the original complaint without rendering it multifarious; and that both grounds of recovery were in fact relied upon at the trial. Furthermore, the intervener claimed that he did not discover the invalidity of the sale that had been made by the Boston Company until he had taken certain testimony in support of his original complaint, and that his failure to allege originally that the sale was invalid was due to his ignorance of the facts which rendered it so. It should also be observed that the record fails to disclose that the appellants saved an exception to the action of the court in permitting the original complaint to be amended. After it was amended they answered the amended complaint, and the case proceeded to a final hearing without objection on their part. In view of these considerations, the appellants cannot be heard to complain of the amendment in this court. It rested in the discretion of the lower court, at the time leave to amend the complaint was asked, to grant or refuse such request, and we are unable to say that such discretionary power was abused or exercised differently than it ought to have been. The court had taken the securities in controversy into its possession for the purpose of administration at the instance of L. W. Anthony, one of the general issue debenture holders. Having the securities in its exclusive control, it was bound to listen to the complaints of third parties who asserted a superior right thereto on any legal or equitable ground. Campbell, the intervener, claimed a superior right to the payment of his demand out of the proceeds of these securities, first, on the ground that they had passed into the possession of the Colorado Company cumbered with a general lien in favor of the creditors of the Kansas Company, because the former company had not paid value for the securities, and was in reality the Kansas Company under a new name. Later he discovered, or thought that he had discovered, that the specific lien which was created in his favor as a debenture holder by the deposit of the securities with the Boston Company had not been foreclosed, whereupon he sought leave to amend his complaint by charging this additional fact. We perceive no reason why such leave should have been denied, inasmuch as it did not alter the kind of relief which he was seeking to obtain as against the general issue debenture holders, provided the lower court was satisfied that the material facts which led to the amendment had been discovered by the intervener since his original complaint was filed. Such seems to have been the case, and in that view the amendment was properly allowed.

Passing to the second proposition stated above, we observe at the outset that the case before us discloses a sale by a trustee of securities which at par amounted to a sum exceeding $250,000 for $15,600, or about one-sixteenth of their par value, of which amount only $612

was actually paid in money. This is a fact which in itself casts suspicion on the fairness of the transaction, and, as the securities appear to have been worth about $175,000, the price at which they were sold justifies the inference that the trustee did not exercise that degree of care and good faith which it was bound to observe. Scanning the transaction more closely, it is discovered that the request for this sale came from George C. Morrell, who was the vice president and the Boston agent of the Colorado Company, and that the request was made for the sole purpose of destroying the lien existing in favor of Campbell, thus enabling the Colorado Company to get possession of the securities for a merely nominal sum, with a view of depositing them with the Real Estate Company as security for its own debentures. This purpose was plainly stated in a letter written on November 5, 1894, by the president of the Colorado Company to the Scotch agent of that company; also in a letter written by the president of the Real Estate Company to the same agent on March 20, 1895. Another circumstance to be noted is that, when Morrell requested the Boston Company to sell the securities, neither he nor the Real Estate Company, for which he claimed at the time to be acting, was the owner of any of the debentures to secure which the securities were held in pledge. The Boston Company was doubtless well aware of that fact. The proposition made to the Scotch debenture holders was a proposition by the Colorado Company to take up and pay off the debt of the Kansas Company which matured November 1, 1894, with its own general issue debentures. It was this proposition that the Scotch debenture holders accepted, and, after the exchange of the securities had taken place in Scotland, the old debentures were transmitted to the Real Estate Company, which thereupon held them, for and in behalf of the Colorado Company, as obligations that had been discharged. It does not appear that the debentures in question were surrendered by the owners thereof as existing obligations, or with the understanding that they should be treated as such and delivered to the Real Estate Company, and that the latter company, as owner of the same, should thereupon call upon the Boston Company to advertise and sell the securities in its hands which were pledged for their payment. No such proposition was made to or accepted by the Scotch debenture holders. The case has been argued upon the theory that the debentures were delivered to the Real Estate Company by the original owners upon the aforesaid understanding, but we find no sufficient evidence to sustain that view. Our conclusion is that the request for the sale of the securities in question came from a person who was not entitled to make the request; that it was made with a view of getting possession of the securities for a trifling sum, and compelling Campbell either to accept general issue debentures for the obligations which he then owned, or to accept his pro rata proportion of the small sum which the persons who devised the scheme expected to bid for the securities when they were exposed for sale. Aside from what has been said, it appears that the Boston Company did not advise Campbell, who resided in Scotland, and who was apparently the only person entitled to demand an execution of the trust, of the intended sale until June

1, 1895. This letter of advice did not reach its destination in Scotland until June 13, 1895, six days before the sale, and it was then too late for the intervener to take any effective steps to protect his interests at the intended sale. In view of these facts, we are of opinion that the trial court very properly adjudged that the sale in question was voidable and ought to be set aside. No doubt can be entertained that the Boston Company was well aware of the motive which prompted Morrell and the companies which he represented to request a sale of the securities. Indeed, in view of all the circumstances of the case, we can scarcely conceive how it could have been ignorant of their motive, or of the object which they hoped to attain by means of the sale. It was also well aware that Campbell held certain debentures that had not been retired, since it forwarded to him a notice of the intended sale on June 1, 1895. The trustee seems to have lent its services willingly in aid of a scheme that was intended to prejudice the rights of one of the beneficiaries in the trust, and, in furtherance of that scheme, permitted the trust securities to be sold for a sum which was grossly inadequate. It goes without saying that a sale made under such circumstances by a trustee cannot be upheld, and ought to be either set aside by a court of equity, or treated simply as a nullity. Drury v. Cross, 7 Wall. 299, 19 L. Ed. 40; Goode v. Comfort, 39 Mo. 313; Howard v. Ames, 3 Metc. (Mass.) 308, 311; Littell v. Grady, 38 Ark. 584; Cook, Stock & S. § 815.

By their third proposition the appellants assert that, although the sale in question was invalid, yet the Boston Company was an indispensable party to any proceeding which might be brought to have the sale adjudged invalid, and that the decree below should be reversed because the Boston Company was not made a party to the action. It will be conceded, of course, that the Boston Company would have been a proper party to the proceeding which was inaugurated in Kansas by the filing of the amended intervening complaint. It is obvious, however, that it could not have been made a party otherwise than by the voluntary entry of its appearance as an intervener, because it was a foreign corporation; and we are unwilling to hold that no relief could be afforded to the intervener because the Boston Company did not elect to intervene. It is also manifest that Campbell could not have proceeded against the Boston Company with a view of annulling the sale except by an original bill exhibited against that company, and that he could not proceed against it in Kansas by an original bill, because it was a Massachusetts corporation, unless it elected to enter its appearance to the action, waiving the issuance and service of process. On the other hand, the assets in controversy, consisting of notes and mortgages on which Campbell claimed a prior lien, were in the exclusive custody of the federal court sitting in Kansas, and were undergoing administration there, and were liable to be distributed at any time for the sole benefit of the holders of the general issue debentures. For these reasons, and because the property was of such a nature that the title would pass by delivery, he was compelled to intervene for the protection of his interests. By thus intervening in the court which had the custody of

the assets, and by asserting, as he did, that his lien had not been extinguished by the sale in Boston, and by asking that the securities in controversy be administered by the court having charge thereof for his benefit, as well as for the benefit of the general issue debenture holders, the intervener, in effect, elected to follow the assets, looking to them for the satisfaction of his debt, rather than to an action against the trustee, who had made an improper sale, and by so doing had suffered the securities to escape from its custody. What the intervener really asked by his intervention was that the sale which had taken place in Boston should be ignored or treated as a nullity; that he be permitted to deposit in court the sum of $612 for the benefit of whom it might concern, that being the total sum of money that had been realized at the sale by the Boston Company; that the original lien created in his favor be treated as still subsisting; and that the same be recognized and enforced in the future administration of the securities. We can perceive no substantial reason why the intervener should not have been permitted to make the election aforesaid, and to demand the relief last stated. The sale that was made in Boston was a mere private sale conducted by one who acted in the transaction not in pursuance of the order or decree of any court, but merely as a private agent of the intervener and the pledgor. The property involved was personal property, the title whereof would pass by delivery. The Boston Company had no substantial interest in the controversy after the intervener had elected to follow the pledged securities into the hands of the receiver of the Colorado Company, and to look to them, rather than to his agent, the trustee, for the satisfaction of his claim. Moreover, the persons for whose benefit the securities had been obtained from the Boston Company and placed in the hands of the Real Estate Company, namely, the general issue debenture holders, were all represented in the action wherein the intervention was filed by the receiver of the Colorado Company. The court had before it, therefore, all the persons who had a substantial interest in the controversy which was raised by the intervention, as well as the power to distribute the proceeds of the securities fairly and equitably among the rival claimants. Equity rule No. 47 provides that:

"In all cases where it shall appear to the court that persons, who might otherwise be deemed necessary or proper parties to the suit, cannot be made parties by reason of their being out of the jurisdiction of the court, or incapable otherwise of being made parties, or because their joinder would oust the jurisdiction of the court as to the parties before the court, the court may, in their discretion, proceed in the cause without making such persons parties; and in such case the decree shall be without prejudice as to the rights of the absent parties."

The case at bar, in our judgment, falls fairly within the provisions as well as the spirit of this rule. It was beyond the power of the intervener to make the Boston Company a party to the suit in Kansas in which he found it necessary to intervene. A suit in Boston would have occasioned much unnecessary delay and expense, and while it was pending the securities in question might have been distributed by the court which had them in its custody. Besides, such interest in the controversy, if any, as the Boston Company may have had,

could be fully protected by appropriate reservations contained in the decree. Under the provisions of the rule, it would seem that when complete relief can be afforded to the parties who are before the court without prejudice to, or with reservations in the decree which will fully protect the rights of, an interested third person who is not before the court and cannot be brought within its jurisdiction, such third person should not be deemed an indispensable party. As the case in hand is one which falls within the latter category, we are of opinion that the Boston Company was not an indispensable party, and that the contention to the contrary should be overruled.

The fourth and fifth propositions on which the appellants rely are closely related, and may be considered together. By these propositions they assert, in substance, that Campbell is in no position to question the validity of the sale that was made by the Boston Company, because he has been guilty of laches in not challenging it at an earlier date, and because he has, in effect, ratified it, by accepting his proportion of the proceeds of the sale. The charge of laches is based on the ground that Campbell did not attempt to have the sale set aside or treated as a nullity until November 21, 1898, the sale having taken place June 19, 1895, whereas a statute of the state of Kansas (Gen. St. Kan. 1897, c. 95, § 12, subd. 3) provides, in substance, that an action for relief on the ground of fraud must be brought within two years; "the cause of action in such cases not to be deemed to have accrued until the discovery of the fraud." It is claimed that this provision of the statute should be held, by analogy, to bar his right to equitable relief. The merits of this contention can be best determined by a brief statement of certain conclusions of fact which have been reached after a careful perusal of the testimony. On August 5, 1895, Campbell, who at all times resided in Scotland, was advised by the Boston Company that the securities in controversy had been sold for the benefit of the debenture holders of the Kansas Company to George C. Morrell for a price that would net $30.60 upon each £100 of outstanding debentures. At that rate Campbell was entitled to receive about $612 on account of the four debentures which he owned. No further information was vouchsafed to him concerning the sale, or the circumstances attending it, or the disposition that had been made of the securities. Some time thereafter Campbell employed certain attorneys who resided in Kansas to attend to his interests in this country. These attorneys advised an action at law upon the four debentures which he held, against the Kansas Company, that had issued them, together with certain supplementary proceedings to be thereafter taken against the stockholders of that company. An action was accordingly brought upon the debentures, which resulted in a judgment against the Kansas Company on November 27, 1897. Before this action was brought, and while it was pending, the intervener's attorneys appear to have had several interviews with the officers of the Colorado Company at the main office of that company, in the city of Topeka, Kan., in the course of which they were informed that the securities that had been sold in Boston had turned out to be practically worthless, and had been sold by the trustee for

about 7 per cent. of their face value. This information was believed to be reliable, and was communicated to the intervener by his attorneys as early as August 15, 1895. Acting upon the knowledge which they had so acquired, the intervener's attorneys advised him to accept his percentage of the supposed proceeds of the sale, and in compliance with such advice a power of attorney was transmitted to them, by virtue of which the sum of $612 was collected from the Boston Company about May 1, 1897. Upon the whole, we are of opinion that the testimony fully warrants the conclusion that when this money was accepted neither the intervener nor his attorneys were acquainted with the value of the securities, or the material circumstances attending the sale which rendered it invalid. Neither the intervener nor his attorneys appear to have known, until the fact was developed by the testimony which was taken after the original intervening complaint had been filed, that the request for the sale of the securities came from one of the officers of the Colorado Company, which at the time held most of the debentures as lifeless obligations; having received them, as before explained, in exchange for its own debentures. The intervener does not appear to have known the conditions on which the other Scotch debenture holders had eventually surrendered them to the Colorado Company. Neither he nor his attorneys appear to have known that the securities, after the sale, passed into the actual custody of the Colorado Company, and were by it handed over to the Real Estate Company, while they were certainly unaware that the alleged sale had been contrived, not for the purpose of realizing the full value of the securities in money, but with a view of depriving the intervener of all interest therein for a trifling sum. Knowledge of these facts in an authentic form came to the intervener only after the original intervening complaint was filed. Previously thereto he seems to have had good reason to suppose that the sale had been conducted in good faith for his benefit, that the securities were of little value, that they had probably been sold for nearly as much as they were worth, and that by reason of the sale they had passed beyond his reach, and were most likely in the hands of innocent purchasers for value. In the light of these findings, the claim that the right asserted by the intervener to impeach the sale of the securities is barred by laches or has been lost by ratification is obviously untenable. The intervener did not discover the material facts which rendered the sale voidable until within two years preceding the filing of his amended intervening complaint, and it cannot be successfully urged that he ought to have discovered them at an earlier date, and is chargeable with negligence because he failed to do so. He resided abroad, and was dependent for information concerning the sale upon the trustee who had conducted it, and upon his attorneys who resided in Kansas, who received their information concerning the sale from the same source, and also from the Colorado Company. He was dealing with corporations who were supposed to be both reliable and responsible. He was advised by the Boston Company that the securities in controversy when exposed to sale at public auction had only brought a small sum, which fact tended to con-

firm the report of his own attorneys that the securities held in pledge by the trustee had turned out to be of comparatively little value. After receiving such a report concerning the value of the securities, and believing, doubtless, that they were of little value, and without knowledge that the securities had passed immediately into the possession of the Colorado Company, and had been delivered by it to the Real Estate Company as security for its own debentures, the intervener elected, as it seems, to pursue the stockholders of the Kansas Company by first obtaining a judgment on his debentures, as he was advised to do. In view of all the circumstances, we fail to perceive in such conduct any want of reasonable diligence. The intervener was not bound to assume, on such information as he possessed, that the Colorado Company had devised a scheme to obtain possession of the securities and to destroy his interest therein, and that the trustee had willingly aided in the accomplishment of that purpose. Unless he had very strong reasons to suspect the contrary, he had the right to presume that the sale had been fairly conducted, and that the securities had been sold for a fair price, and were beyond his reach, in the hands of a bona fide purchaser. At all events, the receiver, as the representative of the Colorado Company, ought not to insist that the intervener should have acted on a different presumption. If it be conceded, therefore, that the case at bar (the same being an intervention in a pending cause) is an action for relief on the ground of fraud, within the purview of the Kansas statute, as to which no definite opinion need be expressed at this time, yet the intervener's right to relief is not barred by limitation or laches. There is even less reason for saying that the intervener has lost his right to relief by ratification, since one will not be held to have ratified an unlawful transaction which he had a right to disaffirm, except by the doing of some act which manifests a clear intent to affirm the transaction after he has acquired full knowledge of all the material facts which rendered the transaction impeachable. Under the foregoing findings, Campbell had no such knowledge of the facts rendering the sale of the securities voidable when he accepted, or empowered his attorneys to accept, the sum of $612 as a part of the proceeds of the sale.

The result is that there is no merit in the appeal prosecuted by Anthony and by the receiver of the Colorado Company.

In support of the cross appeal in case No. 1,516, the intervener contends that the sum awarded to him by the decree of the lower court was inadequate, and that it should have decreed the full payment of his judgment against the Kansas Company out of the proceeds of the securities in the hands of the receiver of the Colorado Company which were originally pledged with the Boston Company to secure the Scotch debenture holders. The reason assigned in support of this contention which deserves the most consideration is as follows: That, when the other Scotch debenture holders of the Kansas Company exchanged their holdings for general issue debentures of the Colorado Company, they released the former company from all liability as a debtor, and also relinquished their lien on the securities then held in pledge by the Boston Company,

thereby leaving them in the hands of the latter company as security for the payment of the four debentures which were owned by the intervener, and not exchanged. This, however, is a very partial view of the transaction, and overlooks some material considerations. When the other Scotch debenture holders exchanged their bonds for general issue debentures of the Colorado Company, they neither intended to relinquish their lien on the securities in question nor to leave them in the hands of the trustee as security for the four debentures which were held by Campbell. If it had been suggested to them that such might be the result of the exchange, we are satisfied that it would never have been effected. The Colorado Company proposed the exchange on the express condition that the general issue debentures to be delivered in exchange should be secured by a deposit with the trustee of "all mortgages and assets of the Colorado Company," including, of course, the securities then in the hands of the Boston Company. This proposition was accompanied by a representation that the securities which would be hypothecated would amount to 140 per cent. of the outstanding debentures to be thereby secured. This proposition was referred by the Scotch debenture holders to a committee of their number for examination and report. The committee so appointed at first recommended as one of the conditions of the exchange that the securities then held by the Boston Company should remain in its custody as a special security for the general issue debentures which were issued to them in exchange for the old obligations, but it was finally persuaded to relinquish this claim because the Colorado Company in reply thereto represented that it desired to place all of its general issue debentures on a plane of perfect equality, so far as the security pledged for their payment was concerned, and that as all of its notes, mortgages, and other assets were to be hypothecated for the payment of the general issue debentures, the holders of the old obligations by the proposed exchange would have greater security than they had previously held. It is undeniable that the exchange was assented to by the Scotch debenture holders upon the understanding that the Boston securities were to form a part of the security for the general issue debentures, and it is a fair inference from the testimony that when they surrendered their old bonds to consummate the exchange they supposed that all the holders of such bonds had agreed to the exchange, and that all the notes and mortgages held by the Boston Company would immediately become subject to a first lien to secure the payment of the new obligations. Nor is there any evidence tending to show that after the exchange had been effected the Scotch debenture holders, or any of them, became parties to the scheme to sell the securities in the custody of the Boston Company, and acquire control of them in the manner heretofore outlined. That scheme appears to have been conceived and carried out by the officers of the Colorado Company with such aid as they were able to obtain from the trustee, or, at least, if the scheme was ever communicated to or aided in any way by any of the debenture holders who were benefited thereby, such fact is not disclosed by the present record. Under these circum-

stances, it would be manifestly inequitable to hold that the wrongful conduct of the Colorado Company whereby the sale of the securities by the trustee was invalidated entitles the intervener to claim payment in full out of the proceeds of the securities acquired from the Boston Company, before the other Scotch debenture holders can share therein, although they were in no way concerned in the wrongful act, and doubtless were not aware of the means that had been resorted to by the Colorado Company and the Real Estate Company to obtain possession of the securities. Nor is such a ruling necessary to preserve the contract rights of the intervener. By the terms of the original deposit of the securities with the Boston Company the intervener became entitled, as the holder of four debentures, to $1/25$, or 4 per cent., of the proceeds of the securities when they should be sold; and as against his fellow debenture holders, who exchanged their bonds for general issue debentures on condition that the Boston securities should be pledged for their payment, he is only entitled to insist that he should receive such a percentage of the proceeds of the securities as was originally promised. If he receives the sum originally promised, he is not entitled to complain, especially in a controversy like the one at bar, which is not a controversy between him and the Colorado Company, but is a controversy between him and the other Scotch debenture holders, who are insisting that their claim upon the securities is fully as meritorious as that of the intervener. In the latter view we fully concur, since they have done no wrong, and were not parties to the scheme to deprive the intervener of his interest in the securities.

It is furthermore insisted by the intervener that, in addition to the special lien aforesaid, he has a species of general equitable lien on all the notes, mortgages, and real estate now in the hands of the receiver, growing out of the circumstance, heretofore explained, that, 11 years since, the Kansas Company transferred all of its assets to the Colorado Company, without other consideration than the capital stock of the latter company. The theory of the intervener is that he is now the sole creditor of the Kansas Company, all of its other creditors having accepted obligations of the Colorado Company in payment of their debts; that a large part of the assets now in the receiver's hands are the assets, or the proceeds of assets, which formerly belonged to the Kansas Company; and that, being the sole creditor of the last-named company, he should be paid in full in preference to every one else, although they were mostly, if not entirely, originally creditors of the Kansas Company. This proposition has been argued at much length by learned counsel for the intervener, but, after a careful consideration of the argument, we have not been able to conclude that the various propositions enunciated therein are sound. And, even if they were sound, we should nevertheless be of the opinion that the right to recover full payment on the ground of a general equitable lien having its origin as far back as the transfer of July, 1890, has been lost by laches. The intervener or his counsel appear to have been aware as early as October, 1894, and probably much earlier, that the Kansas Company had ceased to do business and transferred all of its property

to the Colorado Company. He was also aware, we think, of the material terms of the transfer, and that the great majority of the creditors of the Kansas Company had either accepted or were daily accepting the obligations of the new company in payment for their respective claims. Having that information, and further knowledge of the complications that would necessarily arise if he remained silent, he should have acted promptly if he intended to challenge this transfer as fraudulent, and as having the effect of impressing all the assets of the Colorado Company with an equitable lien in his favor. A man cannot remain silent for three or four years, knowing that one corporation of which he is a creditor has wrongfully transferred its property to another, and that third parties are dealing with the new corporation, and trusting it on the supposition that the transfer was lawful, and then be heard to assert in a court of equity that because of the alleged unlawful transaction he has an equitable lien on all the corporate assets which is superior to the claims of other creditors. Such conduct evidences an intention or a desire to profit by the mistakes of innocent third parties, and ought not to be encouraged. Under the conditions last indicated, therefore, a creditor of a corporation who proposes to challenge the validity of a conveyance that it has made to another company of all of its assets, which he deems unlawful, should act promptly when he is advised of the transfer, or his right to assail it will be lost by acquiescence. In the present instance the testimony shows that the intervener took no action until nearly four years after he was advised of the transaction,—a period of silence and inactivity which must be deemed more than sufficient to bar his right to equitable relief on the ground that he has a general lien.

The decree of the circuit court was formulated, we think, on the right theory, and it meets with our approval, except in one minor respect, to be now mentioned. The lower court awarded to the intervener 4 per cent. of the net proceeds realized by the receiver from the Boston securities, upon the ground that the sale of those securities was invalid, and that the special lien in favor of the intervener had not been extinguished. It also decreed that he should receive 4 per cent. of such sums as might thereafter be realized from notes and mortgages in his hands which had not at the time been collected. It directed that the sum of $612 heretofore received by the intervener from the Boston Company as his distributive share of the proceeds of the sale should be deducted from the sum so awarded to him. It is claimed, however, that the testimony shows that prior to the appointment of a receiver the Real Estate Company or the Colorado Company had collected on account of the securities in question the sum of $62,795, which had been appropriated and used for the exclusive benefit of the general issue debenture holders, and that the intervener should have been allowed 4 per cent. of this sum in addition to the aforesaid allowances. We have not been able to verify the claim thus made as to the amount of these collections prior to the receivership, but some such collections must have been made; and, if they were, we think that the intervener is legally and equitably entitled to 4 per cent. thereof,

as the special lien in his favor was not extinguished by the sale. To the end, therefore, that the amount of the collections prior to the receivership may be accurately ascertained, and that a proper allowance on account of such collections may be made to the intervener, it is ordered that this cause be remanded to the circuit court, with directions to ascertain the amount of said collections, if any were made prior to the receivership, and, having ascertained the amount, to modify its original decree by allowing the intervener 4 per cent. thereof,—the same to be paid out of any funds now in the custody of the receiver,—and that as thus modified the decree below stand affirmed.

SANBORN, Circuit Judge (dissenting). In a single respect the opinion of the majority seems to me to fail to carry to its legitimate conclusion the admirable argument it contains. The securities in the hands of the Boston Company were pledged to secure the payment of the debentures of the Kansas Company. Nineteen-twentieths of those debentures (all but the one-twentieth held by Campbell) were exchanged by their holders for the debentures of the Colorado Company. They were thereby paid, discharged, and surrendered. The securities in the hands of the Boston Company were discharged of all lien to secure their payment, and these securities were not pledged to secure the payment of the debentures of the Colorado Company. The result was that these securities stood pledged for the payment of the four debentures held by Campbell, and for the payment of these alone. These securities, or their proceeds, have come to the possession of the receiver in this case, and he has realized from them far more than an amount sufficient to pay the debt of Campbell. Why should he not first pay out of the proceeds of these securities the entire indebtedness of Campbell, with interest and costs? It does not seem to me to be material that the Colorado Company and the other holders of the Kansas debentures intended to acquire the securities in the hands of the Boston Company, and to pledge them as security for the indebtedness of the Colorado Company. If they had such an intention, it could never have become effective without the payment or the discharge of the established lien which Campbell had upon the securities. That lien covered all of them,—bound them all to pay his debt. It never was discharged, and it seems to me to remain unassailable to the present day. A. issues 20 notes to 20 different holders, and secures them by a pledge of collaterals. B. induces 19 of them to surrender their notes in exchange for his own, and for his promise or intention to obtain the collateral and pledge it to secure his debts. He fails to release it from the lien of A.'s single debtor. The result is that the collateral stands pledged for the payment of the outstanding debt of A., and of that debt alone, and it cannot be lawfully applied to the payment of the indebtedness of B. until the single debt of A. is first discharged. In my opinion, the decree in this case should be for the payment of the entire indebtedness of Campbell from the proceeds of the securities originally pledged to the Boston Company to secure the debentures of the Kansas corporation.