## FOX *v.* PATTERSON.

PRINCIPAL AND AGENT; REAL ESTATE AGENTS; EQUITY; AMENDMENT; FRAUD; EXCHANGE.

1. Where a real estate agent secretly assumes an attitude antagonistic to his principal, the principal may repudiate the entire transaction, and enforce reparation for loss sustained.    (Following *Dahlgren* v. *Story*, 39 App. D. C. 29.)

2. It is not error for a court of equity, after the announcement of its decision, but before the passage of the final decree, in response to a petition by the defendant, the unsuccessful party, for a re-hearing on the ground that the averments of the bill of complaint are not broad enough to justify the decree sought, to permit the plaintiff to amend the bill so as to conform to the case made by the testimony, and to allow the defendant to answer the bill as so amended; nor is it error for the court, under such circumstances, to require the defendant to confine his answer to the bill as amended and the testimony already taken, in the absence of any showing by the defendant that he desires to adduce further testimony.

3. Where a real estate agent, at the time he induced his principal to sign a contract to exchange her seventeen houses for an apartment house, had secretly, in association with another agent, contracted with the owner of the apartment house to buy it, and had made a deposit of $500 thereon, so that in the exchange he was in a position antagonistic to her; and where, in order to make a cash payment of $2,500 to the owner of the apartment house, which her agent represented would be necessary, she executed a second deed of trust on the apartment house for that amount, which the two agents divided between them; and where, prior to her execution of the contract of exchange, the agents had, without her knowledge, effected contracts to sell her properties, which were consummated to their profit; and after she acquired the apartment house, and while her agent was managing it for her, he charged her certain prices for

repairs which included a secret rebate of 10 per cent allowed him by the repairman for doing the work; and thereafter her agent became the purchaser of the apartment house at foreclosure proceedings, paying therefor about $20,000 less than the value at which it had been taken in exchange; so that as the result of her dealings she lost the seventeen houses, which had been sold to an innocent purchaser for value without notice,—it was *held* in a suit by the principal against her agent for an accounting, that she was entitled to a decree for the value of the houses.

No. 2736.   Submitted February 2, 1915.   Decided April 26, 1915.

HEARING on an appeal by the defendant from a decree of the Supreme Court of the District of Columbia, sitting as a court of equity, in a suit for an accounting.          *Affirmed.*

The COURT in the opinion stated the facts as follows:

This is an appeal from a decree in the Supreme Court of the District awarding appellee, Louise Hillard Patterson, on an accounting between her and the appellant, Edmund K. Fox, $29,964.26, with interest from the 9th day of September, 1913, and directing appellant to surrender to appellee certain shares of stock.

The appellant is a real estate agent trading as A. F. Fox Company. Late in 1905 the appellee, Mrs. Patterson, being the owner of seventeen houses in this District, placed them under the management of appellant as her agent. Later, according to her evidence, Mr. Fox suggested that she permit him to trade her properties for an apartment house. They discussed the value of her houses, which she thought worth $77,000, but after further discussion with Mr. Fox she reduced the price to $57,-500. They were then encumbered for $18,000. About May, 1907, Mr. Fox informed Mrs. Patterson that he had discovered a splendid opportunity for her to acquire an apartment house. Thereupon he accompanied her and her daughter in making an inspection of the California. Mrs. Patterson did not again see Mr. Fox until the night of July 9, 1907, when he telephoned her to come to his office, that the California was even better

than he had thought, and that it could be obtained upon a basis of valuation of $52,500 and a valuation of $57,500 for Mrs. Patterson's seventeen properties. Mrs. Patterson and her daughter went to Mr. Fox's office, and in about three hours Mrs. Patterson signed an agreement of exchange. The tax lists produced at the time showed that the California was assessed at $21,260, and Mrs. Patterson's houses at $23,593. Mr. Fox informed Mrs. Patterson that the owner of the California would take her Sunderland place house at $9,000, but would not take any of her other houses, as he wanted cash for his equity. Mrs. Patterson asked why she had been brought in from the country, as Mr. Fox knew she did not have any cash. Thereupon Mr. Fox told her that he would buy her properties for $57,500 if she would give him a year within which to dispose of them; that meantime he would finance her sufficiently to enable her to make the cash payment demanded by Warren; that within one year he would sell her other properties, and apply the proceeds in reduction of the first trust of $35,000 on the California, so that at the end of the year she would own the apartment house subject to an indebtedness of but $10,500; that Fox was to gain or lose accordingly as he might obtain more or less than $57,500 for her properties. Immediately after the transaction Mr. Fox went away on his summer vacation, and was gone several months. In September Mrs. Patterson was given a statement of the transaction in which the valuation of the California was placed at $77,500. This she sought to have corrected. In December Mr. Fox, who had returned in the meantime and had charge of the California for Mrs. Patterson, notified her that the building association which held the first trust was threatening foreclosure proceedings. The result of the interview that followed was that Mrs. Patterson consulted an attorney, and his interviews with Fox resulted, in January, 1908, in an agreement between Fox and Mrs. Patterson whereby Fox was to retain control of the California for fifteen months, advance sufficient money to avert foreclosure, pay Mrs. Patterson a stated sum per month, and reimburse himself out of the rents of the apartment house. On May 26, 1910, Fox filed a bill against

Mrs. Patterson, claiming that she was indebted to him for moneys on an accounting as her real estate agent. The bill sought an equitable lien upon certain stock, and the sale of the California Apartment House for the purpose of paying any balance of the debt alleged by Fox to be due him from Mrs. Patterson. Mrs. Patterson, prior to this, had instructed her counsel to bring suit against Mr. Fox, and, as soon as their engagements permitted, this suit was filed, the date of the filing being June 18, 1910. Mrs. Patterson's bill set forth the facts previously narrated: that by means of appellant's representations and her reliance upon him and them he had induced her, on said July 9, 1907, to sign a paper agreeing to the transfer of her properties to one Allen McLane Abert, whom Fox at that time represented to be the owner of the California, with Warren the builder having a lien thereon; that she requested that there be put into the agreement the valuation of $57,500 on her properties and $52,500 on the apartment house, but appellant had persuaded her that this was not necessary, saying that "the agreement was merely designed to carry out a working understanding," and that all matters would be correctly set forth in a statement he would render her, but this statement she did not obtain until September following; that Fox meanwhile had disposed of her properties hastily and upon such terms that they were promptly resold by the purchasers in many instances at considerably higher figures; that she placed her affairs in the hands of an attorney, but was advised by him, because of the imminent danger of foreclosure, to execute an agreement whereby appellant should control her apartment house for fifteen months, appellee being destitute of means through the deception of appellant, it being stated to her that this agreement would not bar proceedings by her against appellant, but would avert foreclosure. The prayers of the bill were for an accounting, a decree in the sum of $26,000, with interest from July 9, 1907, together with such further sum as might be found due complainant, the appointment of a receiver for the California, and such final order with reference thereto as might be proper, a dis-

covery from Fox of the gross amount realized from the disposition of each of complainant's houses, and for general relief.

In his answer to the bill of Mrs. Patterson Fox alleged that, at the time of the exchange by Mrs. Patterson of her properties for the California, a Mr. Lampton was the agent for the sale or exchange of the apartment house, which was owned by John L. Warren; that Mr. Warren was not willing to trade for Mrs. Patterson's houses, but was willing to sell the California and take over the Sunderland place house as part of the deal for $12,500; that Fox was informed by Lampton that Warren valued his equity in the California at $20,000, leaving $12,500 to be paid in cash, the Sunderland place house having a trust on it of $5,000; that Fox, knowing Mrs. Patterson had no money, proposed that she deed her Sunderland place house to Warren and the remainder of her properties to Abert, and that Fox and Lampton would pay Warren the cash he required, and sell Mrs. Patterson's properties at their discretion, assuming any risk of loss in the premises, and receiving any profit therefrom. The answer further averred that the fifteen months agreement was entered into by Fox "in the belief and understanding that it constituted a compromise and settlement of plaintiff's alleged claim against him." It further alleged that this fifteen months agreement had not worked out as expected, and that upon its expiration appellant refused to surrender control of the apartment house except upon condition of immediate payment by Mrs. Patterson of her alleged indebtedness to him. All charges of fraud were denied. The two bills were consolidated, and the trial resulted in the decree previously mentioned.

Mrs. Patterson introduced evidence tending to support the averments of her bill, and, as the result of a subpœna duces lecum on Mr. Warren, it was made to appear that on July 9, 1907, prior to the signing of the agreement of exchange by Mrs. Patterson, a written agreement was entered into by Mr. Warren and the real estate firm of Early & Lampton, who signed as "Agents for Allan McLane Abert," a straw man, under which Mr. Warren acknowledged the receipt of a deposit of $500 as "part payment of purchase" of the California ·Apartment

House, the terms of sale being $55,000, $12,500 cash, assumption of an existing trust of $35,000, and the equity in No. 1914 Sunderland place (one of Mrs. Patterson's houses). In other words, $7,500 was to be allowed for the equity in this Sunderland place house. This agreement was signed in the daytime, and Mr. Warren did not know Abert or the owner of the Sunderland place house. Mr. Lampton, testifying under cross-examination, stated that prior to the night of July 9, 1907, Mrs. Patterson's properties had been shown to Mr. Warren, who had "decided to take a certain piece of the Patterson property and so much cash down;" that Mrs. Patterson was not informed of the Abert contract for the purchase of the house. He stated that the $500 deposit was made to Warren by check of Early & Lampton, and that this was done under an agreement with Fox that he should bear half of it. It was his impression that Fox had a copy of that contract. He further stated that Abert was simply a straw man. He was asked whether Mrs. Patterson was told that the owners of the California were Early & Lampton and the Fox Company, and replied in the negative. He further testified that when he was introduced to Mrs. Patterson, on the night she signed the agreement of exchange, he then discovered that Fox was agent for her properties. "Fox," said the witness, "was a party to whatever agreement there was with Warren. Fox and Early & Lampton had agreed to share and share alike in the deposit if forfeited. Fox knew whatever agreement had been made with Warren, and 'am sure that Mr. Fox knew every move that was made in the case.' By agreement between Fox and Early & Lampton the profits, if any, were to be shared equally." While Fox denied that he knew Lampton had made the $500 deposit under the contract for the purchase of the California, a rough memorandum prepared by his office, showing an account between Early & Lampton and the Fox Company, contained the following item: "By deposit to Warren $500." Without elaboration, we think it clear beyond controversy that Mr. Fox not only knew of but was a party to the Abert contract of purchase. In other words, when the transaction with Mrs. Patterson was consummated, Mr. Fox, notwith-

standing that he was representing to her that he was acting as her agent and solely in her interest, was in fact financially interested in the property he was trading her.

The evidence further tended to show that Mr. Fox, on the night of the exchange, represented to Mrs. Patterson that it would be immediately necessary to pay Mr. Warren $2,500 in cash; that he, Fox, would loan her this amount, securing it by second trust upon the apartment house. She executed this trust, but the $2,500 was divided between Fox and Lampton. It further appeared that prior to Mrs. Patterson's execution of the contract of exchange there already had been effected, without her knowledge, agreements of sale of a number of her houses, so that the amount realized by Fox and Early & Lampton from those sales, with the $2,500 loaned on second trust, practically liquidated the $12,500 due Warren under their contract of sale with him, leaving Fox and Early & Lampton the remainder of Mrs. Patterson's properties as profit. It further appeared that while Fox was agent for Mrs. Patterson for the renting of her houses he charged her with certain prices for repairs made, which included a secret rebate or commission of 10 per cent allowed him from the repairmen doing the work. Between the filing of Mrs. Patterson's bill and the decree Mr. Fox had become the owner of the California by purchase under foreclosure proceedings, paying therefor about $37,500. In other words, Mrs. Patterson, as the result of her transactions through Mr. Fox, lost her seventeen houses.

After final hearing upon the pleadings, testimony, and exhibits, and after the court had announced its decision and a decree had been presented for signature, counsel for appellant filed a petition for rehearing upon the ground that the averments of Mrs. Patterson's bill were not broad enough to justify the decree. Thereupon the court directed that Mrs. Patterson "should have permission, if necessary, to amend said bill so as to conform to the case made by the said testimony, exhibits, and proceedings, upon such terms as might be just and equitable." This amendment she filed, and the court allowed the appellant to answer the same, requiring, however, that his answer be con-

fined to the testimony already taken.   The decree set aside the agreement of exchange, and, finding that Mrs. Patterson's seventeen houses had been transferred to innocent purchasers for value without notice, ordered that Fox account to Mrs. Patterson for their value.

*Mr. Charles Poe* and *Mr. P. H. Marshall* for the appellant.

*Mr. Henry E. Davis, Mr. Chas. H. Merrillat,* and *Mr. Charles J. Kappler* for the appellee.

*Mr. Justice* ROBB delivered the opinion of the Court:

It is first objected that the court erred in permitting the appellee to amend her bill and the appellant to make answer thereto, and at the same time denying to appellant the right to make further proof.   In her original bill Mrs. Patterson averred that Fox had been guilty of deceit as her agent, and the evidence tended to support the averment.   The evidence that Fox was interested in the California was not inconsistent with the averments of the bill, but rather tended to support term.   This evidence was met, so far as it was possible to be met, by Fox, and the case was fully argued before the trial court without a suggestion by him, so far as this record discloses, that more time should be given within which to take further testimony.   The first objection to the complaint came after the announcement of an adverse decision.   That it was within the discretion of the court then to grant leave to amend is beyond question.   *Wiggins Ferry Co.* v. *Ohio & M. R. Co.* 142 U. S. 396, 35 L. ed. 1055, 12 Sup. Ct. Rep. 188; *Morrow Shoe Mfg. Co.* v. *New England Shoe Co.* 24 L.R.A. 417, 6 C. C. A. 508, 18 U. S. App. 256, 57 Fed. 685, 692.   The amendment conformed to the case made by the evidence, and could not have been included in the original bill because the facts averred in the amendment, while known to Fox, were not known to Mrs. Patterson when the original bill was filed. This circumstance constituted an additional ground for al-

lowing the amendment. *Anthony* v. *Campbell,* 50 C. C. A.
195, 112 Fed. 212; *Hobson* v. *Hobson,* 105 Va. 394, 53 S.
E. 964. While in allowing an amendment the rights of a de-
fendant should be carefully safeguarded, there is nothing in
the present case even tending to show that Mr. Fox suffered
any injustice because no further testimony was taken. In his
answer to the amendment he avers that he did not have any
pecuniary interest in the California "adverse to plaintiff;"
that he was not aware of the Abert contract, "though necessarily
some contract was required in order to bind said Warren and
procure said apartment house for plaintiff as contemplated by
said exchange." While he excepted to the action of the court
in allowing the amendment and in confining him to the mat-
ters then in evidence, he nowhere suggested that he had any
further evidence to offer. In other words, his objection to the
amendment was purely technical, and, we think, wholly with-
out merit.

It is next contended that the so-called fifteen months agree-
ment amounted to a compromise and adjustment of all matters
in dispute between Mr. Fox and Mrs. Patterson. To this con-
tention there are two sufficient answers: First, the agreement
itself and the testimony relating thereto negative appellant's
contention; and, second, it was entered into by Mrs. Patterson
without knowledge of the very material fact that her agent was
financially interested in the property for which he induced
her to trade. Foreclosure proceedings were imminent, and
under this agreement, as previously stated, Mr. Fox was to
manage the California for fifteen months. Such was the scope
and purpose of the agreement. Both Mr. Hardcastle and Mr.
Slater, the attorneys who were acting for Mrs. Patterson, testi-
fied that it was stated to Mr. Fox that the sole object of the
agreement was to avert foreclosure proceedings, and that the
agreement "was not intended to affect any rights which Mrs.
Patterson might have or he (Fox) might have in the future
in reference to the exchange of Mrs. Patterson's properties for
the California." It was a very natural agreement for Fox to
make, for under it he retained control of the California, and

the *status quo* was maintained, for the time being at least. A compromise entered into by one party in ignorance of material facts suppressed by the other party is not voluntary, and will not be enforced . *Wheeler* v. *Smith,* 9 How. 82, 13 L. ed. 55; *Cammack* v. *Lewis,* 15 Wall. 643, 21 L. ed. 244. So we rule that this fifteen months agreement was not understood or treated by the parties as a compromise, and that, even if it had been, it would not have been binding upon the appellee, for the reasons stated.

That the court below was justified in setting aside the contract of exchange there can be no doubt. Mr. Fox was and had been for some time the agent of Mrs. Patterson. The record shows that he possessed her confidence to a marked degree. She was relying upon him to represent her interests, and hers alone, and she had a right to assume that he would do so. He grossly betrayed his trust, and led her into a disastrous venture. Instead of serving her, as in duty and justice he was bound to do, he was serving himself. When she and her daughter went to his office, neither Mr. Warren nor Mr. Abert was the owner of the California. An enforceable contract of purchase had been executed and a payment of $500 made thereon, under which Early & Lampton and Fox were to become the real owners. Instead, therefore, of Mr. Fox being in a position to act solely in the interest of Mrs. Patterson, he had secretly assumed a position antagonistic to her. Such conduct cannot be too strongly condemned, and where it has occurred the principal may repudiate the entire transaction and enforce reparation for losses sustained. *Dahlgren* v. *Story,* 39 App. D. C. 29; *Forrest* v. *Wardman,* 40 App. D. C. 520.

It is objected that the court's valuation of Mrs. Patterson's properties wrongfully converted by Mr. Fox is too high. The court fixed the value of these properties at $44,350, making their net value $26,350. In reaching this estimate the court fixed the gross value of the Sunderland place house at $8,000, whereas Fox and Early & Lampton were allowed $12,500 for it in their deal with Warren. The court, after a careful consideration of the evidence, fixed the value of the other prop-

erties, and, without discussing that evidence, we conclude that the valuation was reasonable and conservative.

Having disposed of all questions necessary to be considered, we affirm the decree, with costs.          *Affirmed.*